## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| CENTER FOR PUBLIC INTEGRITY, | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| v. | )     Case No. 19-3265 (CKK) |
| | ) |
| U.S. DEPARTMENT OF DEFENSE et al., | ) |
| | ) |
| *Defendant.* | ) |
| | ) |

**UNOPPOSED MOTION FOR LEAVE TO FILE *AMICUS CURIAE* BRIEF ON BEHALF OF AMERICAN OVERSIGHT AND DEMOCRACY FORWARD FOUNDATION IN SUPPORT OF PLAINTIFF CENTER FOR PUBLIC INTEGRITY'S CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Civil Rule 7(o), American Oversight and Democracy Forward Foundation (collectively, the "proposed *amici*") respectfully move for leave to file the accompanying *amicus curiae* brief in support of Plaintiff Center for Public Integrity's Cross-Motion for Summary Judgment and Opposition to the Motion for Summary Judgment filed by Defendants the U.S. Department of Defense and the Office of Management and Budget (ECF No. 22), attached hereto as Exhibit 1.[1] Specifically, the accompanying proposed *amicus curiae* brief addresses the proper scope of two privileges implicated by the records requested in this case: the presidential communications privilege and the deliberative process privilege, as well as the practical implications and real-world ramifications of allowing those privileges to be expanded in the manner attempted by the government here. A proposed order is attached hereto as Exhibit 2.

---

[1] Counsel for both Plaintiff and Defendants have indicated that they consent to this motion.

This Court has "broad discretion" to allow participation by an *amicus*, *District of Columbia v. Potomac Elec. Power Co.*, 826 F. Supp. 2d 227, 237 (D.D.C. 2011), and regularly allows the submission of briefs by *amici* who have "a special interest in th[e] litigation as well as a familiarity and knowledge of the issues raised therein that could aid in the resolution of th[e] case." *Ellsworth Assocs., Inc. v. United States*, 917 F. Supp. 841, 846 (D.D.C. 1996); *see also Potomac Elec. Power*, 826 F. Supp. 2d at 237 (granting leave to file *amicus* brief where *amicus* had "relevant expertise and a stated concern for the issues at stake in th[e] case" and where the Court "f[ound] that it may benefit from their input"). "The filing of an *amicus* brief should be permitted if it will assist the judge 'by presenting ideas, arguments, theories, insights, facts or data that are not to be found in the parties' briefs.'" *Comm. of the N. Mariana Islands v. United States*, No. CIVA 08-1572 PLF, 2009 WL 596986, at *1 (D.D.C. Mar. 6, 2009) (quoting *Voices for Choices v. Ill. Bell Tel. Co.,* 339 F.3d 542, 545 (7th Cir. 2003)). Furthermore, "*[a]micus* participation is normally appropriate when . . . 'the *amicus* has an interest in some other case that may be affected by the decision in the present case[.]'" *Hard Drive Prods., Inc. v. Does 1-1,495*, 892 F. Supp. 2d 334, 337 (D.D.C. 2012) (quoting *Jin v. Ministry of State Sec.*, 557 F. Supp. 2d 131, 137 (D.D.C. 2008)).

Proposed *amici* have a strong interest in this case because the Court's disposition will substantially affect their fundamental goals: promoting transparency in government, educating the public about government activities, and ensuring the accountability of government officials:

- American Oversight is a nonpartisan, non-profit section 501(c)(3) organization committed to the promotion of transparency in government, the education of the public about government activities, and ensuring the accountability of government officials. Through research and FOIA requests, American Oversight uses the information it gathers, and its analysis of it, to educate the public about the activities and operations of the federal government through reports, published analyses, press releases, and other media.

- Democracy Forward Foundation ("Democracy Forward") is a nonpartisan non-profit corporation organized under section 501(c)(3) of the Internal Revenue Code and incorporated under the laws of the District of Columbia. Democracy Forward works to promote transparency and accountability in government, in part, by enhancing public awareness of unlawful government actions and policies. As part of this work, Democracy Forward regularly requests federal agency records through FOIA.

Those goals would be significantly hindered by permitting the government to expand the scope of the deliberative process privilege and presidential communications privilege beyond their permissible bounds. The proposed *amici* regularly litigate FOIA requests that potentially implicate those privileges, and the Court's decision regarding the scope of these oft-invoked privileges could have significant implications for FOIA cases brought by the proposed *amici*. Proposed *amicus* American Oversight also currently has pending litigation regarding its own FOIA requests relating to OMB's decision to withhold aid from Ukraine, and, in response to those requests, OMB has withheld material while relying on many of the same privileges they have asserted in this case. *See Am. Oversight v. OMB et al.*, No. 19-3213 (D.D.C. filed Oct. 25, 2019). The records at issue in that case overlap to some extent with the records at issue in this case, but there are additional non-overlapping records involved in both cases.

The proposed *amici* believe that the accompanying brief will assist the Court in addressing the Defendants' Motion for Summary Judgment by bringing valuable perspective and context to the complex legal issues and potential consequences at issue in this case. The proposed *amici* have unique expertise and perspective that they bring to bear on the questions presented here. The proposed *amici* have significant and substantial experience litigating FOIA issues of the type raised by this case. In the last year alone, American Oversight has briefed questions regarding the proper scope of the presidential communications privilege on several occasions, including in situations not dissimilar to the one at issue here, where an agency has relied on the presidential communications privilege to withhold communications that are wholly

internal to an executive agency, or do not directly involve the President or any other senior presidential advisor. *See, e.g.*, Cross-Mot. for Summ. J., *Am. Oversight v. DOD*, No. 17-787, (Dec. 4, 2019), ECF No. 31-1; Cross-Mot. for Summ. J. at 30–36, *Am. Oversight v. GSA*, No. 18-2419 (Dec. 4, 2019), ECF No. 23-1; Cross-Mot. for Summ. J. at 31–35, *Am. Oversight v. OMB*, No. 18-2424 (June 28, 2019), ECF No. 19-1. And American Oversight and Democracy Forward have briefed questions regarding the proper scope of the deliberative process privilege— including when records are sufficiently predecisional to merit protection under the privilege—on numerous occasions. *See, e.g.*, Cross-Mot. For Summ. J., *Democracy Forward Found. v. Ctrs. for Medicare & Medicaid Servs.*, No. 18-635 (D.D.C. Jan. 13, 2020), ECF No. 36.

In addition to the extensive experience that the proposed *amici* have gained during the course of litigations brought by their respective organizations, several members of American Oversight's and Democracy Forward's leadership and litigation teams served as executive branch lawyers prior to joining the organization, and so bring a uniquely valuable perspective to the various institutional interests implicated by the privileges at issue in this case.

Given the significant interest by the proposed *amici* in the development of the law in this area, we believe that these questions may not receive adequate attention in the parties' merits briefs, which also address numerous other legal issues and focus on the specific set of records at issue in this case. The accompanying brief not only addresses the underlying legal principles at issue in this case, but also focuses on the likely practical consequences of expanding the Exemption 5 privileges in the manner attempted by the government here.

For all these reasons, the proposed *amici* have a special interest in this litigation and are uniquely positioned to provide the Court with important and helpful information.

## CONCLUSION

For the foregoing reasons, the proposed *amici* respectfully request that this motion for leave to file the accompanying *amicus* brief be granted.

Dated: February 14, 2020

Respectfully submitted,

*/s/ Austin R. Evers*
Austin R. Evers
D.C. Bar No. 1006999
Christine Monahan
D.C. Bar No. 1035590
Daniel A. McGrath
D.C. Bar No. 1531723
AMERICAN OVERSIGHT
1030 15th Street NW, B255
Washington, DC 20005
(202) 869-5246
austin.evers@americanoversight.org
christine.monahan@americanoversight.org
daniel.mcgrath@americanoversight.org

Sean A. Lev, D.C. Bar No. 449936
Nitin Shah, D.C. Bar No. 156035
DEMOCRACY FORWARD
FOUNDATION
1333 H Street NW, 11th Floor
Washington, DC 20005
(202) 448-9090
slev@democracyforward.org
nshah@democracyforward.org

*Counsel for the Proposed* Amici Curiae

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Motion and attachments will be served on this 14th day of February 2020, electronically through the Court's CM/ECF system on all registered counsel.

Dated: February 14, 2020          Respectfully submitted,

/s/ Austin R. Evers
Austin R. Evers
D.C. Bar No. 1006999
AMERICAN OVERSIGHT
1030 15th Street NW, B255
Washington, DC 20005
(202) 869-5246
austin.evers@americanoversight.org

*Counsel for the Proposed* Amici Curiae

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| CENTER FOR PUBLIC INTEGRITY, | ) |
| *Plaintiff*, | ) |
| v. | )     Case No. 19-3265 (CKK) |
| U.S. DEPARTMENT OF DEFENSE et al., | ) |
| *Defendant*. | ) |

## [PROPOSED] ORDER

It is hereby ORDERED that the motion of American Oversight and Democracy Forward Foundation for leave to file a brief as *amici curiae* in support of Plaintiff Center for Public Integrity's Opposition to Defendants' Motion for Summary Judgment, which was filed with this Court on February 14, 2020, is GRANTED.

IT IS SO ORDERED.

_____
Hon. Colleen Kollar-Kotelly
United States District Court Judge


Dated: _____, 2020

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| _____ | ) | |
| CENTER FOR PUBLIC INTEGRITY, | ) | |
|  | ) | |
| *Plaintiff*, | ) | |
|  | ) | |
| v. | ) | Case No. 19-3265 (CKK) |
|  | ) | |
| U.S. DEPARTMENT OF DEFENSE et al., | ) | |
|  | ) | |
| *Defendant.* | ) | |
| _____ | ) | |

**MEMORANDUM OF *AMICI CURIAE* AMERICAN OVERSIGHT AND DEMOCRACY FORWARD FOUNDATION IN SUPPORT OF PLAINTIFF CENTER FOR PUBLIC INTEGRITY'S CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSTION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## <u>DISCLOSURE STATEMENT</u>

Pursuant to Local Civil Rule 7(o)(5) of this Court and Rules 26.1 and 29(a)(4)(A) of the

Federal Rules of Appellate Procedure, *amici curiae* state the following:

American Oversight does not have a parent company, subsidiaries, or affiliates, and no

publicly held corporation owns 10 percent or more of its stock. American Oversight is a non-

profit corporation organized under section 501(c)(3) of the Internal Revenue Code.

Democracy Forward Foundation does not have a parent company, subsidiaries, or

affiliates, and no publicly held corporation owns 10 percent or more of its stock. Democracy

Forward Foundation is a non-profit corporation organized under section 501(c)(3) of the Internal

Revenue Code.

## TABLE OF CONTENTS

STATEMENT OF INTEREST ................................................................................................ 1

ARGUMENT ....................................................................................................................... 3

    I.   The Presidential Communications Privilege Is Narrow and Reaches Purely Intra- or Inter-Agency Records Only in Limited Circumstances. ......................................... 5

    II.  Directives, Agency Actions, and the Reasons for Them Are Not Privileged. ............ 10

    III. Information Concerning Government Misconduct Does Not Fall Within the Scope of the Deliberative Process Privilege. ........................................................................ 15

    IV. The Presidential Communications Privilege Should Not Reach Communications Concerning Government Misconduct, Particularly Where the President Participated in or Directed That Misconduct. ............................................................ 21

    V.  Atypical Privilege Claims Over Small Numbers of Documents Warrant *In Camera* Review. ...................................................................................................................... 23

CONCLUSION .................................................................................................................. 25

## <u>TABLE OF AUTHORITIES</u>

<u>CASES</u>

*Alexander v. FBI*,
     186 F.R.D. 154 (D.D.C. 1999) ............................................................................................. 17

*Brinton v. Dep't of State*,
     636 F.2d 600 (D.C. Cir. 1980) ............................................................................................. 11

\*Carter v. U.S. Dep't of Commerce,
     830 F.2d 388 (D.C. Cir. 1987) ......................................................................................... 23, 24

\*Citizens for Responsibility & Ethics in Wash.  v. U.S. Dep't of Homeland Sec.,
     514 F. Supp. 2d 36 (D.D.C. 2007) ................................................................................... 6, 7, 9

\*Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Homeland Sec.,
     592 F. Supp. 2d 111 (D.D.C. 2009) .................................................................................... 7, 9

*Coastal States Gas Corp. v. Dep't of Energy*,
     617 F.2d 854 (D.C. Cir. 1980) ............................................................................................. 11

\*Ctr. for Effective Gov't v. U.S. Dep't of State,
     7 F. Supp. 3d 16 (D.D.C. 2013) ..................................................................................... passim

*Elec. Frontier Found. v. U.S. Dep't of Justice*,
     739 F.3d 1 (D.C. Cir. 2014) ................................................................................................. 16

*Elec. Privacy Info. Ctr. v. Nat'l Sec. Agency*,
     87 F. Supp. 3d 223 (D.D.C. 2015) ........................................................................................ 13

*Envtl. Prot. Agency v. Mink*,
     410 U.S. 73 (1973) ................................................................................................................. 3

*Hunton & Williams LLP v. EPA*,
     346 F. Supp. 3d 61 (D.D.C. 2018) ........................................................................................ 11

\*In re Sealed Case,
     121 F.3d 729 (D.C. Cir. 1997) ....................................................................................... passim

*Judicial Watch of Fla., Inc. v. U.S. Dep't of Justice*,
     102 F. Supp. 2d 6 (D.D.C. 2000) .......................................................................................... 20

\*Judicial Watch, Inc. v. U.S. Dep't of Defense,
     913 F.3d 1106 (D.C. Cir. 2019) .................................................................................... 8, 9, 12

*Judicial Watch, Inc. v. U.S. Dep't of Justice,*
    365 F.3d 11085 (D.C. Cir. 2004) ................................................................ *passim*

*Judicial Watch, Inc. v. U.S. Dep't of State,*
    No. 13-CV-772 (CKK), 2019 WL 4228341 (D.D.C. Sept. 5, 2019) ....................................... 24

*Lam Lek Chong v. DEA,*
    929 F.2d 729 (D.C. Cir. 1991) ................................................................ 23

*Loving v. U.S. Dep't of Def.,*
    550 F.3d 32 (D.C. Cir. 2008) ................................................................ 11, 12

*Maydak v. U.S. Dep't of Justice,*
    218 F.3d 760 (D.C. Cir. 2000) ................................................................ 20

*Nat'l Archives & Records Admin. v. Favish,*
    541 U.S. 157 (2004) ................................................................ 3

*Nat'l Sec. Archive v. CIA,*
    752 F.3d 460 (D.C. Cir. 2014) ................................................................ 16

*Nat'l Whistleblower Ctr. v. U.S. Dep't of Health & Human Servs.,*
    903 F. Supp. 2d 59 (D.D.C. 2012) ................................................................ 17, 19

*Nixon v. Adm'r of Gen. Servs.,*
    433 U.S. 425 (1977) ................................................................ 12

*NLRB v. Robbins Tire & Rubber Co.,*
    437 U.S. 214 (1978) ................................................................ 3

*NLRB v. Sears, Roebuck & Co.,*
    421 U.S. 132 (1975) ................................................................ 11

*Petroleum Info. Corp. v. U.S. Dep't of Interior,*
    976 F.2d 1429 (D.C. Cir. 1992) ................................................................ 3, 11

*Prop. of the People, Inc. v. Office of Mgmt. & Budget,*
    330 F. Supp. 3d 373 (D.D.C. 2018) ................................................................ 7, 9

*Quiñon v. FBI,*
    86 F.3d 1222 (D.C. Cir. 1996) ................................................................ 23, 24

*Ray v. Turner,*
    587 F.2d 1187 (D.C. Cir. 1978) ................................................................ 23

*Renegotiation Bd. v. Grumman Aircraft,*
    421 U.S. 168 (1975)...................................................................................................... 11

*\*Tax Reform Research Group v. IRS,*
    419 F. Supp. 415 (D.D.C. 1976) ............................................................................. 17, 19

*Tri-State Hosp. Supply Corp. v. United States,*
    226 F.R.D. 118 (D.D.C. 2005)....................................................................................... 17

*United States v. Nixon,*
    418 U.S. 683 (1974)........................................................................................................ 3


**STATUTES**

5 U.S.C. § 552................................................................................................................ 20, 23


**OTHER AUTHORITIES**

December 12, 2019 Production, *Ctr. For Public Integrity v. DOD et al.*, Case No. 19-3265
    (D.D.C.) ........................................................................................................................ 14

December 20, 2019 Production, *Ctr. For Public Integrity v. DOD et al.*, Case No. 19-3265
    (D.D.C.) ........................................................................................................................ 14

Jacques Singer-Emery & Jack Goldsmith, *The Role of OMB in Withholding Ukraine Aid*,
    Lawfare (Oct. 16, 2019, 4:00 PM), https://bit.ly/2SJRKp9 ....................................... 19

Jacques Singer-Emery, Margaret Taylor & Jack Goldsmith, *More on the Role of OMB in
    Withholding Ukrainian Aid*, Lawfare (Oct. 23, 2019, 2:39 PM), https://bit.ly/37tQhbS ......... 19

Kate Brannen (@K8brannen), TWITTER, (Jan. 28, 2020, 9:37 AM), https://bit.ly/2waBciu........ 25

Kate Brannen, *Exclusive: Unredacted Ukraine Documents Reveal Extent of Pentagon's
    Legal Concerns*, Just Security, Jan. 2, 2020, https://bit.ly/2UOiLdT ....................................... 25

S. Conf. Rep. No. 1200, 93d Cong. 2d Sess. (1974).................................................................... 23

Sam Berger, *Trump's Hold on Ukraine Military Aid Was Illegal*, Just Security,
    Nov. 26, 2019, https://bit.ly/2OSwKM3.................................................................................... 19

*The Trump-Ukraine Impeachment Inquiry Report*, H.R. Permanent Select Comm. on
    Intelligence, Dec. 2019, https://bit.ly/2w9OxYn ................................................................ 19, 22

U.S. Gov't Accountability Office, B-331564, *Decision Matter of: Office of Management and Budget—Withholding of Ukraine Security Assistance*, Jan. 16, 2020, https://bit.ly/37ldhde .......................................................................................................... 18

## <u>STATEMENT OF INTEREST</u>

*Amici curiae* are non-profit organizations that support government transparency and accountability and promote government ethics, including through the use of Freedom of Information Act (FOIA) requests.[1] Each has substantial experience and expertise in the practical workings of FOIA. *Amici* also frequently litigate FOIA cases including cases involving the government's application of both the deliberative process privilege and the presidential communications privilege and have developed expertise on these privileges. *Amici* seek to file this *amicus curiae* memorandum to supplement the Court's understanding of the proper scope of the presidential communications privilege and deliberative process privilege and the potential consequences of expanding those privileges in the way the government attempts to do in this case.

American Oversight is a nonpartisan, nonprofit section 501(c)(3) organization committed to the promotion of transparency in government, the education of the public about government activities, and ensuring the accountability of government officials. Through research and FOIA requests, American Oversight uses the information it gathers, and its analysis of it, to educate the public about the activities and operations of the federal government through reports, published analyses, press releases, and other media. American Oversight frequently requests records from federal government agencies that potentially implicate the privileges at issue here. American Oversight also has extensive experience litigating the scope of those privileges. In the last year alone, American Oversight has briefed questions regarding the proper scope of the presidential

---

[1] *Amici* confirm that no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and no person, other than *amici*, their members, or their counsel, contributed money that was intended to fund preparing or submitting the brief.

communications privilege on several occasions, including in situations not dissimilar to the one

at issue here, where an agency has relied on the presidential communications privilege to

withhold communications that are wholly internal to an executive agency, or do not directly

involve the President or any other senior presidential advisor. *See, e.g.*, Cross-Mot. for Summ. J.,

*Am. Oversight v. DOD et al.*, No. 18-787 (Dec. 4, 2019), ECF No. 31-1; Cross-Mot. for Summ.

J. at 30–36, *Am. Oversight v. GSA et al.*, No. 18-2419 (Dec. 4, 2019), ECF No. 23-1; Cross-Mot.

for Summ. J. at 31–35, *Am. Oversight v. OMB*, No. 18-2424 (June 28, 2019), ECF No. 19-1.[2]

Democracy Forward Foundation ("Democracy Forward") is a nonpartisan non-profit

corporation organized under section 501(c)(3) of the Internal Revenue Code and incorporated

under the laws of the District of Columbia. Democracy Forward works to promote transparency

and accountability in government, in part, by enhancing public awareness of unlawful

government actions and policies. As part of this work, Democracy Forward regularly requests

federal agency records through FOIA, including records that potentially implicate the privileges

at issue in this case. Democracy Forward regularly litigates FOIA requests in which agencies

have asserted the privileges at issue in this case, and Democracy Forward has litigated the proper

scope of privileges under Exemption 5 of FOIA. *See, e.g.*, Cross-Mot. for Summ. J., *Democracy

Forward Found. v. Ctrs. for Medicare & Medicaid Servs.*, 18-cv-635 (Jan. 13, 2020).

---

[2] *Amicus* American Oversight also currently has pending litigation regarding its own FOIA
requests relating to OMB's decision to withhold aid from Ukraine, and in response to which
OMB has relied on many of the same exemptions they have applied in this case. *See Am.
Oversight v. OMB et al.*, No. 19-3213 (D.D.C. filed Oct. 25, 2019). The records at issue in that
case overlap to some extent with the records at issue in this case, but there are additional non-
overlapping records involved in both cases.

## **ARGUMENT**

The deliberative process privilege, at its core, is intended to protect candid pre-decisional advice and recommendations to senior decisionmakers in the formulation of agency policy.[3] The presidential communications privilege is even narrower, limited only to ensuring that presidential decisionmaking is informed by robust advice and relevant information from senior presidential aides.[4] Agencies may not assert these privileges in support of broad exemption claims that operate not to protect a decisionmaking process but instead to conceal or obscure government conduct; withhold directives or guidance issued by senior decisionmakers; hide the real rationale underlying government decisions; or suppress embarrassing or troubling information.

It undermines both FOIA and the values of transparency and accountability the statute embodies if agencies can conceal from citizens basic facts about what the government is up to. Congress enacted FOIA to give the public access to information about government operations in order to inform public participation in democratic decisionmaking and ensure that the public can hold the government accountable for its actions. As the Supreme Court has repeatedly explained, "[t]he basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978); *see also Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 172 (2004) (emphasizing that the public's knowledge of government action is "a structural necessity in a real democracy."). These

---

[3] *Petroleum Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429, 1435 (D.C. Cir. 1992) ("The deliberative process privilege, we underscore, is centrally concerned with protecting the process by which *policy* is formulated.") (citing *Envtl. Prot. Agency v. Mink*, 410 U.S. 73, 87 (1973)).

[4] *United States v. Nixon*, 418 U.S. 683, 708 (1974) ("A President and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately.").

promises of transparency and accountability are made real only if courts rigorously evaluate whether the agency has demonstrated the elements necessary to show that a claimed privilege actually applies, construe the exemptions narrowly as precedent demands, and compel agencies to give the public the information it is entitled to under the law.

This is particularly the case where FOIA requesters seek timely disclosure of records related to high-profile matters of intense public interest, such as the records at issue in this case. Because the validity of agency withholding decisions is typically only resolved on summary judgment after production is complete, improper or overbroad exemption claims can delay disclosures until the public controversy has passed, depriving the public of the information it needs to participate in an informed manner and potentially allowing officials to evade accountability for their conduct. Thus, it is incumbent on the Court to carefully evaluate the government's claims of privilege here to ensure that the government has met its burden of demonstrating that the requisite elements are, in fact, present.

The cursory support provided by Defendants appears to fall far short. To begin with, the presidential communications privilege is narrow and typically applies only to communications directly involving the president, vice president, or senior White House advisors to the president. Nearly all, if not all, of the redacted communications appear to reach only DoD and, in some cases, OMB officials, and were not received by any covered White House officials. Binding D.C. Circuit precedent makes clear that the presidential communications privilege extends to purely internal or inter-agency communications only in very limited circumstances, and Defendants have not established that those narrow conditions are met here.

Both the agency declarations and a review of the redacted records also suggest that the withheld material may, in some instances, contain information about agency actions; directives

or guidance by senior decisionmakers to agency officials; and the reasons for those actions, directives, or guidance. But widely disseminated communications implementing decisions that have already been made fall outside the scope of both the deliberative process privilege and the presidential communications privilege.

Finally, the records at issue in this case appear to relate to troubling governmental misconduct—that is, an unlawful withholding of funds appropriated by Congress in violation of the Impoundment Control Act of 1974 in furtherance of an improper scheme to coerce a foreign ally to investigate the President's political opponents. As cases in this district have recognized, the deliberative process privilege does not apply to communications concerning governmental misconduct or violations of the law. Likewise, the presidential communications privilege— which is supported by a policy rationale very similar to the one underpinning the deliberative process privilege—should also not apply to protect such communications, particularly where, as here, there is evidence that the President was involved in the relevant government misconduct.

At a minimum, the facts of this case—including the unusual and attenuated nature of the privileges asserted, the possibility these records involve governmental misconduct, and the likelihood of waiver given the large amount of information regarding these issues already publicly disclosed—weigh strongly in favor of *in camera* review of the redacted materials.

## I.     The Presidential Communications Privilege Is Narrow and Reaches Purely Intra- or Inter-Agency Records Only in Limited Circumstances.

The presidential communications privilege is a narrow privilege that protects certain communications between the president, vice president, and senior presidential advisors regarding presidential decisionmaking. Its purpose is to "ensure that presidential decisionmaking is of the highest caliber, informed by honest advice and full knowledge." *In re Sealed Cas*e, 121 F.3d 729, 750 (D.C. Cir. 1997). The D.C. Circuit has repeatedly emphasized that it must be "carefully

circumscribed" and "construed as narrowly as is consistent with ensuring that the confidentiality

of the President's decisionmaking process is adequately protected." *Id.* at 752. Because of the

"dangers of expanding it too far," *Judicial Watch, Inc. v. U.S. Dep't of Justice* (*Judicial Watch

I*), 365 F.3d 1108, 1114–15 (D.C. Cir. 2004), the D.C. Circuit has advised that "[t]he presidential

communications privilege should never serve as a means of shielding information regarding

governmental operations that do not call ultimately for direct decisionmaking by the President,"

*In re Sealed Case*, 121 F.3d at 752.

Given its focus on protecting direct presidential decisionmaking, as a general matter, the

privilege does not reach purely internal agency communications or interagency communications

for the simple reason they are not communications with the president, vice president, or a

covered senior presidential advisor. The D.C. Circuit has explained that "the privilege should not

extend to staff outside the White House in executive branch agencies." *In re Sealed Case*,

121 F.3d at 752. Thus, for example, in a FOIA case involving the Department of Justice's Office

of the Pardon Attorney, the D.C. Circuit held that the presidential communications privilege does

not extend to internal agency records, even when those records contain information relevant to

presidential decisionmaking, so long as those communications were not themselves "authored or

solicited and received" by a senior presidential advisor. *See Judicial Watch I*, 365 F.3d at 1116–

17. Following this precedent, courts in this district have denied summary judgment to agencies

claiming the privilege as to "communications that were not actually transmitted to the White

House advisers or their staff," *Citizens for Responsibility & Ethics in Wash.  v. U.S. Dep't of

Homeland Sec.* (*CREW I*), 514 F. Supp. 2d 36, 50 (D.D.C. 2007); *see also Citizens for

Responsibility & Ethics in Wash. v. U.S. Dep't of Homeland Sec.* (*CREW II*), 592 F. Supp. 2d

111, 118 (D.D.C. 2009); *Prop. of the People, Inc. v. Office of Mgmt. & Budget*, 330 F. Supp. 3d
373, 389 (D.D.C. 2018).

This limitation on the privilege holds true even where internal or inter-agency
communications contain information with some connection to presidential decisionmaking, but
were not themselves "solicited and received" by a covered White House official. The D.C.
Circuit expressly held that the privilege does not reach internal agency deliberations, including
the gathering of information, even if the purpose of those internal discussions is ultimately to
inform agency advice or recommendations to the president, *see Judicial Watch I*, 365 F.3d
at 1115, including with respect to internal agency documents that were created "for the sole
purpose of advising the President on a non-delegable duty," *id*. at 1117. According to the D.C.
Circuit, an extension of the privilege to purely internal agency records would be "unprecedented
and unwarranted." *Id.* This is due in no small part to the fact that the "presidential
communications privilege, as its name and the Circuit's opinions suggest, extends only to
*communications*," not *information* writ large that may, at some later point, also be included in a
separate communication to the White House. *CREW II*, 592 F. Supp. 2d at 118 (emphasis
added); *see also Prop. of the People, Inc*, 330 F. Supp. 3d at 389 ("the presidential
communications privilege does not shield internal agency communications that never reached the
President or immediate White House advisers, even if the documents bear on matters of
Presidential decisionmaking"); *CREW I*, 514 F. Supp. 2d at 49 (holding that the mere fact that
internal agency communications are "'intended' for White House advisers or 'revealing'
communications with White House advisers" is insufficient to trigger the presidential
communications privilege).

To be sure, the D.C. Circuit has recognized that there may be limited circumstances where an agency can establish that the presidential communications privilege properly applies to a record without demonstrating that the record itself was communicated to a covered White House official, provided that the agency demonstrates that the record memorializes prior advice or recommendations that *were* communicated to the president or to a senior presidential advisor for purposes of advising presidential decisionmaking. *See*, *e.g.*, *Judicial Watch, Inc. v. U.S. Dep't of Defense* (*Judicial Watch II*), 913 F.3d 1106, 1111–12 (D.C. Cir. 2019) (holding that the presidential communications privilege applied to five records memorializing legal advice to the president and senior White House advisors regarding the raid on Osama bin-Laden's compound). Even in those circumstances, however, it is necessary for the agency to show that the record reflects advice or recommendations actually communicated to a covered White House official, not just internal agency preparations to gather information or provide recommendations that might subsequently be used in presidential communications.

There are substantial questions about whether the presidential communications privilege can properly apply to the records at issue in this case when these limitations on the privilege are taken into account. The records for which Defendants have invoked the presidential communications privilege here appear to be almost exclusively internal agency records or communications between OMB and DOD, two federal agencies subject to FOIA. Defendants do not argue that any covered White House official solicited and received these particular *communications* themselves. And as discussed above, internal agency and inter-agency communications that only contain information gathered in connection with potential future presidential deliberations, but which are not themselves communications with covered senior presidential advisors, are not covered by the privilege. *See Judicial Watch I*, 365 F.3d at 1115–

17; *CREW I*, 514 F. Supp. 2d at 48–50; *CREW II*, 592 F. Supp. 2d at 118; *Prop. of the People, Inc.*, 330 F. Supp. 3d at 389. Defendants also do not aver that these records fall into the narrow category of internal agency records that reflect the substantive content of prior advice or recommendations to the president and therefore also might properly be subject to the privilege. *Cf. Judicial Watch II*, 913 F.3d at 1111–12. Consequently, Defendants have not met their burden of establishing that the privilege properly extends to these records.

Rather than make these required showings, Defendants instead fall back on cursory and insufficient claims about the records. Defendants' *Vaughn* Index variously describes the bulk of the records at issue as inter- or intra-agency email exchanges that "include[] references to communications involving the President or his immediate advisors,"[5] or involving "the President, the Vice President, or his immediate advisors,"[6] and sometimes as inter- or intra-agency email exchanges that "include[] a *specific* reference to communications involving the President or his immediate advisors"[7] (emphasis added). The other two records are described as "briefing materials and talking points prepared for [the Secretary of Defense] in anticipation of a meeting with the President or his immediate advisors."[8] These minimal descriptions plainly fail to establish either that these particular communications were "solicited and received" by a covered White House official, or that they contain information that reflects the substantive content of prior advice and recommendations to such an official.[9] OMB provides no basis to

[5] Decl. of Heather Walsh at Ex.3, ECF No. 22-4 ("*Vaughn* Index"), Doc. Nos. 12, 13, 20, 33, 44, 56, 63, 64, 78 & 107.

[6] *Vaughn* Index Doc. Nos. 34 & 35.

[7] *Vaughn* Index Doc. Nos. 37, 57, 82, 83, 92, 95 & 99.

[8] *Vaughn* Index Doc. Nos. 108 & 109.

[9] The bare assertion that an internal or interagency email "references" in some way some communication with the president, the vice president, or an unspecified immediate advisor to the president does not suffice to show the privilege properly applies. OMB's declaration provides no

conclude that any generic "references" to communications—indeed, even "specific" references to communications—disclose information regarding the content of advice or recommendations actually provided to the president. Internal agency records containing bare references that simply indicate a communication occurred, but do not reflect the content of any advice or recommendations to the president, are not covered by the privilege.

## II.  Directives, Agency Actions, and the Reasons for Them Are Not Privileged.

The unredacted portions of the records at issue as well as Defendants' description of the discussions contained in those records also strongly suggest that much of the redacted material consists of post-decisional information such as directives from senior officials to agency employees and discussions about the implementation of such decisions. Of course, directives to agencies to take an action, actual actions taken by an agency, and the reasons for those decisions are not shielded from disclosure under the deliberative process privilege and would only be protected by the presidential communications privilege in the relatively rare circumstances when

support for the conclusion that the withheld material reflects the substantive content of any actual advice or recommendation to the president or a senior presidential advisor in any way whatsoever. This paucity of information is only further underscored by the elaboration that only a small subset of the emails include a "specific" reference to a communication with the president, the vice president, or presidential advisor, whatever the distinction between a (presumably general) reference and a *specific* reference may be in this context. Nor does the generic assertion, without reference to any particular document, that the redacted portions of these documents include *information* purportedly solicited and received by the President or by the Senior Advisor to the White House Chief of Staff, *see* Decl. of Heather Walsh, at ¶ 32 ECF No. 22-4 ("Walsh Decl."), suffice to meet Defendants' burden. To begin with, an assistant to the chief of staff, twice removed from the president, such as Robert Blair, does not qualify as an "immediate" advisor to the president, and Defendants have offered no evidence that he was acting on behalf of a qualifying White House official. Even setting that aside, such a generic statement divorced from any particular document lacks the specificity necessary to meet the agencies' burden, particularly given that the declaration is written in terms of "information" rather than actual communications protected by the privilege. This shortcoming is further underscored by the failure of the declaration's promise that these facts are "reflected in the *Vaughn* Index," *id.*, to be borne out by review of the relevant entries on that index.

the information was confidential and closely held.

Consistent with its purpose of protecting the agency's policymaking process, the deliberative process privilege is limited to materials that are "'predecisional' and 'deliberative.'" *Loving v. U.S. Dep't of Def.*, 550 F.3d 32, 38 (D.C. Cir. 2008) (citing *In re Sealed Case*, 121 F.3d at 737). A record is "predecisional" when "it was 'prepared in order to assist an agency decisionmaker in arriving at his decision,' rather than to support a decision already made," and "deliberative" when it "reflects the give-and-take of the consultative process." *Petroleum Info. Corp.*, 976 F.2d at 1434 (quoting *Renegotiation Bd. v. Grumman Aircraft,* 421 U.S. 168, 184 (1975) and *Coastal States Gas Corp. v. Dep't of Energy,* 617 F.2d 854, 866 (D.C. Cir. 1980)). Documents are not "predecisional" and "deliberative" if they "simply state or explain a decision the government has already made or protect material that is purely factual." *In re Sealed Case*, 121 F.3d at 737. Thus, "Exemption 5 does not protect final statements of policy or final actions of agencies, which have the force of law or which explain actions the agency has already taken; nor does it protect communications that promulgate or implement an established policy of an agency." *Brinton v. Dep't of State*, 636 F.2d 600, 605 (D.C. Cir. 1980) (citing *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 153–54 (1975)). Similarly, "[d]irectives from decisionmakers are not covered by the deliberative process privilege." *Hunton & Williams LLP v. EPA*, 346 F. Supp. 3d 61, 79 (D.D.C. 2018) (citing *Coastal States Gas Corp.*, 617 F.2d at 866); *see also Brinton*, 636 F.2d at 605 (describing the inapplicability of the privilege to "final opinions," which "flow from a superior with policy-making authority to a subordinate who carries out the policy").

The presidential communications privilege, for similar reasons, cannot be applied to presidential directives that are "distributed and implemented widely throughout the Executive Branch." *Ctr. for Effective Gov't v. U.S. Dep't of State*, 7 F. Supp. 3d 16, 25 (D.D.C. 2013). The

presidential communications privilege exists primarily to ensure sufficient space to allow the

president to "obtain frank and informed opinions from his senior advisers." *Judicial Watch II*,

913 F.3d at 1110 (citing *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 448–49 (1977)); *In re*

*Sealed Case*, 121 F.3d at 750 ("[T]he privilege itself is rooted in the need for confidentiality to

ensure that presidential decisionmaking is of the highest caliber, informed by honest advice and

full knowledge."). To be sure, courts have found that the presidential communications privilege

may protect certain post-decisional communications by the president that remain confidential

and closely held among senior presidential advisors, where the continued confidentiality of those

directives is necessary to preserve the space for robust presidential deliberations. *See Loving*, 550

F.3d at 37–38 ("The privilege covers documents reflecting 'presidential decisionmaking and

deliberations,' regardless of whether the documents are predecisional or not.") (citing *In re*

*Sealed Case,* 121 F.3d at 744–45). But the presidential communications privilege does not apply

to final decisions by the president that are widely circulated and implemented within the broader

executive branch. *See Ctr. for Effective Gov't*, 7 F. Supp. 3d at 25.

This follows from the fact that the privilege "should be construed as narrowly as is

consistent with ensuring that the confidentiality of the President's decisionmaking process is

adequately protected." *In re Sealed Case*, 121 F.3d at 752; *see also Judicial Watch I*, 365 F.3d at

1112 (emphasizing need for courts "to strike a balance between the twin values of transparency

and accountability of the executive branch [and] protection of the confidentiality of Presidential

decision-making and the President's ability to obtain candid, informed advice"). Thus,

"[c]onfidentiality is the touchstone of the privilege." *Ctr. for Effective Gov't*, 7 F. Supp. 3d at

24–25. And the president's confidentiality interests are not implicated where information is

widely shared beyond those senior presidential advisors with "close operational proximity" to the

12

president. *Id.*; *see also In re Sealed Case*, 121 F.3d at 752 ("[T]he privilege should not extend to staff outside the White House in executive branch agencies."); *see also supra* Section I.

Thus, courts in this district have properly held that widely distributed presidential directives are not protected by the presidential communications privilege. *See Ctr. for Effective Gov't*, 7 F. Supp. 3d 16 (D.D.C. 2013); *Elec. Privacy Info. Ctr. v. Nat'l Sec. Agency*, 87 F. Supp. 3d 223, 233 (D.D.C. 2015) (agreeing with *Ctr. for Effective Gov't*'s holding that widely distributed presidential directives are not subject to Exemption 5). In *Center for Effective Government*, this court considered for the first time whether the privilege could apply to a "presidential directive." 7 F. Supp. 3d at 21; *see also id.* at 24 n.8. The court ruled that the directive in question, which was a "*final, non-classified*, communication [that was] widely distributed within the Executive Branch and implemented by lower-level staff members," *id.* at 30, could not be withheld. As the Court explained, "the purposes of the [presidential communications] privilege are not furthered by protecting from public disclosure presidential directives distributed beyond the President's closest advisers for non-advisory purposes." *Id.* at 27. The court rejected the government's "unbounded" position, which seemed to claim that "the mere fact that a President's direct involvement in a communication, either as an author or recipient, renders it automatically protected." *Id.* at 28. Instead, the Court emphasized the limited nature of the privilege, explaining that "the privilege's application to 'final' decisions, as in any other circumstance, is no broader than necessary to ensure that the confidentiality of the presidential decision-making process, and its concomitant decision-making benefits, are 'adequately protected.'" *Id.* at 24 (citing *Judicial Watch I,* 365 F.3d at 1116).

In this case, there is good reason to believe the withheld and redacted material includes non-privileged, post-decisional material. OMB's declaration describes the discussion contained

in the responsive records as addressing "how best to execute a series of short-term budgetary apportionment actions." Walsh Decl. ¶ 18. An apportionment action, of course, follows a final agency decision. Records describing how a decision is implemented, or "execute[d]," likewise cannot be withheld since the deliberative process privilege cannot shield records of actions actually taken by agencies. Further, Defendants appear to have failed to segregate nondeliberative factual information in several locations.[10]

Likewise, OMB describes the redacted information as "reflecting communications by either the President, the Vice President, or the President's immediate advisors regarding Presidential decision-making about the scope, duration, and purpose of the hold on military assistance to Ukraine," Walsh Decl. ¶ 31, although the actual entries in the *Vaughn* Index only describe the redacted content as containing "references" to such communications, not as "reflecting" them. Of course, information provided to federal agencies reflecting decisions about the scope, duration, or purposes of a hold on spending obligated funds would not be privileged given that it is post-decisional and was not closely held. Similarly, it is unclear why information about "the status of an ongoing decision-making process," *id.* ¶ 32, so long as it did not disclose the content of the deliberations, would itself be privileged.

A review of the unredacted portions of the records reinforces these concerns. The disclosed portions of the records suggest that they reflect ordinary internal and inter-agency discussions about how to implement decisions that have already been made, or possibly directives from senior decisionmakers that agency employees are executing. At best, although

---

[10] Plaintiff in this action has posted the records produced by Defendants on the internet. *See* December 12, 2019 Production at 096–101, *Ctr. For Public Integrity v. DOD et al.*, Case No. 19-3265 (D.D.C.), https://bit.ly/2OSFdyM; December 20, 2019 Production at 015–16, *Ctr. For Public Integrity v. DOD et al.*, Case No. 19-3265 (D.D.C.), https://bit.ly/37shqfs.

neither the declarations nor the *Vaughn* Index establish these facts, some of the redacted records might possibly be examples, like in *Center for Effective Government*, of employees of executive branch agencies who are not White House officials and "serve no role in either the Cabinet or NSC" being informed of a presidential directive so that they could implement the White House's already-made and widely-discussed decision. 7 F. Supp. 3d at 25.[11] Regardless, these actions, and the reasons provided for these decisions, are not privileged.

## III.    Information Concerning Government Misconduct Does Not Fall Within the Scope of the Deliberative Process Privilege.

It is well-established that the scope of the deliberative process privilege is limited by the admonition that it cannot shield agency records from disclosure where they concern misconduct or unlawful action. The privilege exists to encourage honest, candid advice in governmental decisionmaking processes. But when decisionmakers have engaged in misconduct or unlawful action, the interests underlying the privilege are not served by preventing disclosure of documents containing communications relevant to those actions. The privilege is not intended to ensure candor when government actors are deliberating over how to break the law. It is not a co-conspirators' privilege. Where, as here, a FOIA requester can show that there is a substantial likelihood that agency actions were unlawful and related to misconduct—such as by pointing to a formal finding by a government oversight body and the testimony of numerous government

---

[11] December 12, 2019 Production at 106–08, *Ctr. For Public Integrity v. DOD et al.*, Case No. 19-3265 (D.D.C.), https://assets.documentcloud.org/documents/6575105/CPI-v-DoD-12-Dec-19-Release.pdf; December 20, 2019 Production at 022–23, *Ctr. For Public Integrity v. DOD et al.*, Case No. 19-3265 (D.D.C.), https://assets.documentcloud.org/documents/6590667/CPI-v-DoD-Dec-20-2019-Release.pdf.

officials—the deliberative process privilege cannot shield agency communications about those actions from disclosure.

Courts have long recognized that the central policy rationale underlying the existence of the deliberative process privilege is that it serves "to encourage the candid and frank exchange of ideas in [an] agency's decisionmaking process" by ensuring such candor necessary for effective decisionmaking is not chilled by the threat of disclosure. *Nat'l Sec. Archive v. CIA*, 752 F.3d 460, 462 (D.C. Cir. 2014); *see also Elec. Frontier Found. v. U.S. Dep't of Justice*, 739 F.3d 1, 13 (D.C. Cir. 2014). The privilege consequently "disappears altogether when there is any reason to believe government misconduct occurred," because "shielding internal government deliberations in [the] context [of misconduct] does not serve 'the public's interest in honest, effective government.'" *In re Sealed Case*, 121 F.3d at 738, 746.

Importantly, this misconduct exception limits the *scope* of the privilege's protection, and defines records concerning potential government misconduct to be entirely outside that scope. Thus the presence of a reason to believe that deliberations involve official misconduct or unlawful acts is not simply a factor to be weighed in determining whether a party overcomes the qualified privilege through a showing of need;[12] rather the misconduct exception defines the scope of the privilege such that deliberations concerning potential misconduct are not privileged in the first instance. *See id.* ("[T]he privilege disappears altogether when there is any reason to believe government misconduct occurred."); *Alexander v. FBI*, 186 F.R.D. 154, 164 (D.D.C. 1999) (rejecting government argument that balancing test was required to overcome

---

[12] The deliberative process privilege is a qualified privilege, which can be overcome by a sufficient showing of need for the privileged information. *In re Sealed Case*, 121 F.3d at 737 n.5, 746. In the FOIA context, some courts have concluded that, because a FOIA requester's reasons for seeking the requested information are not relevant under the statute, qualified privileges cannot be overcome on the basis of a showing of "need" for the information. *Id*. at 737 n.5.

deliberative process privilege and holding "that the deliberative process privilege does not apply if there is a discrete factual basis for the belief that 'the deliberative information sought may shed light on government misconduct'" (quoting *In re Sealed Case*, 121 F.3d at 746)); *Tri-State Hosp. Supply Corp. v. United States*, 226 F.R.D. 118, 135 (D.D.C. 2005) ("Under the government misconduct exception, there is no need to engage in a balancing test because the privilege does not apply at all.").

Consequently, courts in this District have for decades recognized that the government misconduct exception prevents agencies from withholding information related to government misconduct under the deliberative process privilege in FOIA cases. In *Tax Reform Research Group v. IRS*, for instance, the court held that memoranda related to White House deliberations over using the IRS in a "selective and discriminatory fashion" against opponents of the Nixon administration were not "part of the legitimate governmental process intended to be protected by Exemption 5," and were thus subject to disclosure. 419 F. Supp. 415, 426 (D.D.C. 1976). The court reasoned that deliberations need not be protected from disclosure when they were not "part of any proper governmental process," and, in an uncanny echo of recent events, concludes that the communications regarding the use of "a government agency to deliberately harass an opposition political party" cannot be privileged. *Id.* Courts considering the misconduct exception have concluded that it applies when FOIA requesters "provide an adequate basis for believing that [the requested documents] would shed light upon government misconduct." *Nat'l Whistleblower Ctr. v. U.S. Dep't of Health & Human Servs.*, 903 F. Supp. 2d 59, 67–68 (D.D.C. 2012) (citation omitted) (finding that Office of Special Counsel letter concluding there was a "substantial likelihood" agency violated a law or regulation and declarations from agency

employees supported *in camera* review to determine if withheld records would shed light on government misconduct).13

The documents at issue in this case—which Defendants have broadly redacted under an assertion of the deliberative process privilege—plainly contain information directly related to unlawful government actions and governmental misconduct of the highest order. The records contain communications between OMB and DoD concerning the obligation of funds appropriated by Congress to provide security assistance to Ukraine during a time period when OMB was improperly acting to prevent those appropriated funds from being released. The Government Accountability Office ("GAO") specifically and formally determined that OMB repeatedly violated the Impoundment Control Act of 1974 ("ICA") by using footnotes in apportionment schedules to improperly withhold funds appropriated to DOD to provide security assistance to Ukraine. *See* U.S. Gov't Accountability Office, B-331564, *Decision Matter of: Office of Management and Budget—Withholding of Ukraine Security Assistance*, Jan. 16, 2020, https://bit.ly/37ldhde.14 Furthermore, the alleged misconduct does not stop with these violations

---

13 Some courts in this district have mistakenly, in the view of the *amici*, conflated the government misconduct exception to the deliberative process privilege—which defines deliberations concerning misconduct as outside the *scope* of the privilege—with the showing of need a plaintiff may make in civil litigation to gain access to privileged information and thus found that the misconduct exception does not apply to FOIA cases because the plaintiff's need is not relevant under the statute. *See Judicial Watch, Inc. v. U.S. Dep't of State*, 241 F. Supp. 3d 174, 183 (D.D.C.), *amended on reconsideration on other grounds*, 282 F. Supp. 3d 338 (D.D.C. 2017). The D.C. Circuit in *In re Sealed Case*, however, clearly distinguished between the balancing of need that may overcome the qualified deliberative process privilege in civil litigation, and the fact that "the privilege *disappears altogether* when there is *any reason* to believe government misconduct occurred." 121 F.3d at 746 (emphases added).

14 Legal experts on the power of the executive branch—including a former head of the Department of Justice's Office of Legal Counsel and a former senior OMB lawyer—agree that OMB cannot lawfully use its apportionment power to withhold appropriated funds to achieve policy aims, and that OMB's action to prevent obligation of appropriated security assistance to Ukraine was unlawful. *See* Jacques Singer-Emery & Jack Goldsmith, *The Role of OMB in Withholding Ukraine Aid*, Lawfare (Oct. 16, 2019, 4:00 PM), https://bit.ly/2SJRKp9; Jacques

of the ICA; rather, the evidence indicates that these unlawful acts were part and parcel of a concerted effort by President Trump to use official acts to pressure Ukraine into investigating his political rival, former Vice President Biden, and his family. High-ranking officials testified, and provided documentary evidence, that they understood these unlawful delays in the assistance to Ukraine were improperly motivated by the president's desire to pressure Ukraine to announce an investigation of one of his political opponents.[15]

The agencies' violation of the law identified by GAO, particularly viewed in the context of the evidence developed by congressional inquiries of a larger campaign to use official actions by the U.S. government to coerce a foreign government to investigate a political rival of the President, shows precisely the type of "extreme government wrongdoing"—here, misconduct that threatens the separation of powers and the very foundations of American democracy— concerning the subject matter of the records at issue in this case that prevents a finding that the relevant documents are properly privileged. *Nat'l Whistleblower Ctr.*, 903 F. Supp. 2d at 68. Deliberations that are not part of a "legitimate governmental process"—like those which concern "using a government agency to deliberately harass an opposition political party"—cannot be shielded from disclosure by the deliberative process privilege. *Tax Reform Research Grp.*, 419 F. Supp. at 426. In light of the substantial reason to believe that the withheld materials relate to this governmental misconduct, Defendants have failed to meet their burden of demonstrating that

Singer-Emery, Margaret Taylor & Jack Goldsmith, *More on the Role of OMB in Withholding Ukrainian Aid*, Lawfare (Oct. 23, 2019, 2:39 PM), https://bit.ly/37tQhbS; Sam Berger, *Trump's Hold on Ukraine Military Aid Was Illegal*, Just Security, Nov. 26, 2019, https://bit.ly/2OSwKM3.

[15] *See The Trump-Ukraine Impeachment Inquiry Report* at 127–39, H.R. Permanent Select Comm. on Intelligence, Dec. 2019, https://bit.ly/2w9OxYn (summarizing testimony of Ambassadors Gordon Sondland, Bill Taylor, Kurt Volker, and other officials supporting the finding that releasing the hold on assistance appropriated to aid Ukraine was conditioned on Ukraine announcing or undertaking an investigation of former Vice President Biden and his son).

communications surrounding that misconduct are properly privileged and exempt from disclosure.[16] Moreover, even if there were some technical view in which portions of these records were properly privileged, Defendants also have not adequately made the independent and required showing that withholding the redacted information is necessary because of a foreseeable harm to an interest protected by an exemption, *see* 5 U.S.C. § 552(8)(A)(i)(I). In light of the evidence of misconduct, there is no—and logically can be no—foreseeable harm from the disclosure of evidence of governmental wrongdoing to the interest of the deliberative process privilege in protecting candor in legitimate decisionmaking processes. Given that there is reason to believe that disclosing the redacted material would shed light on unlawful actions and governmental misconduct with respect to Defendants' unlawful actions to withhold assistance Congress appropriated to aid Ukraine as part of a scheme to coerce Ukraine to investigate one of the President's political rivals, records containing deliberations concerning those actions are not properly subject to the deliberative process privilege.[17]

---

[16] It is the government's burden to prove the applicability of all FOIA exemption claims it asserts. *Maydak v. U.S. Dep't of Justice*, 218 F.3d 760, 764 (D.C. Cir. 2000). Although the government may not generally have to prove in the first instance that *all* documents over which it asserts the deliberative process privilege do not concern government misconduct, in the face of substantial evidence of such misconduct the government must provide evidence of the absence of such wrongdoing to meet its burden. *Cf. Judicial Watch of Fla., Inc. v. U.S. Dep't of Justice*, 102 F. Supp. 2d 6, 15 (D.D.C. 2000) (finding that the government was not required to show the absence of misconduct "in the first instance" where the FOIA requester "failed to provide an adequate basis for believing" misconduct occurred).

[17] Between the GAO's formal finding of unlawful acts and the evidence produced in congressional inquiries that these unlawful acts were part of a broader, improper scheme to use official governmental acts to coerce Ukraine to investigate one of the President's political rivals, there is undoubtedly sufficient *prima facie* evidence the records relate to governmental conduct to shift the burden to Defendants to demonstrate that the records do not, in fact, relate to misconduct. Moreover, even if Defendants dispute GAO's formal finding that the agencies' actions unlawfully violated the Impoundment Control Act of 1974, the question of whether the delays in funding were unlawful is a legal question appropriate for resolution by the courts. Anything less would limit the misconduct exception to cases in which the executive branch

**IV.    The Presidential Communications Privilege Should Not Reach Communications Concerning Government Misconduct, Particularly Where the President Participated in or Directed That Misconduct.**

For similar reasons, the presidential communications privilege should be construed not to reach communications regarding misconduct or unlawful governmental conduct, at least where there is reason to believe the president is directly involved in that misconduct or unlawful act. Courts have not ruled directly on whether the government misconduct exception applies to the presidential communications privilege. However, that privilege exists for purposes that are nearly identical to the deliberative process privilege: to ensure "the President's access to honest and informed advice and his ability to explore possible policy options privately" in the service of "presidential decisionmaking." *In re Sealed Case*, 121 F.3d at 751. The policy interest in protecting presidential decisionmaking upon which the privilege rests does not extend to presidential decisions to engage in governmental misconduct or to direct government actors to violate the law. Just as the deliberative process privilege cannot be invoked to prevent disclosure of deliberations that were not "part of any proper governmental process," *Tax Reform Research Group*, 419 F. Supp. at 426, the presidential communications privilege should not shield documents from disclosure that were not part of a legitimate "presidential decisionmaking" process.

*Amici* acknowledge that the court in *In re Sealed Case* reasoned that separation of powers concerns should prevent the courts or Congress from easily negating the constitutionally based presidential communications privilege, 121 F.3d at 745, and stated in dicta that overcoming the privilege "seemingly" requires a showing of need, *id.* at 746. But the facts at issue in that case

agrees it has transgressed, a standard that would be rarely met and could be easily circumvented by minimal protestations of innocence in the face of substantial independent evidence.

differ materially from the facts here. *In re Sealed Case* involved allegations of misconduct by a senior administration official, former Secretary of Agriculture Mike Espy, but there were no allegations that the President was himself implicated in any way in the alleged wrongdoing. *Id.* at 734–35. The court consequently expressed concern about the president's ability to receive frank advice and accurate information concerning his subordinates' misconduct in order to take action to remediate that conduct, particularly through the appointment and removal power and the duty to take care that the laws are faithfully executed. *Id.* at 753–54.

These concerns do not apply where, as here, there is substantial evidence that the President himself was directly and personally involved in governmental misconduct. In cases where the president has personally participated in, or even directed, the relevant government misconduct, the separation of powers concerns the Circuit expressed in *In re Sealed* case simply do not apply with any logical force. Here, witnesses in the congressional impeachment inquiry have provided evidence that the President himself, in order to secure an announcement of an investigation of one of his political opponents, directed that OMB improperly withhold aid that Congress appropriated to assist Ukraine. *See The Trump-Ukraine Impeachment Inquiry Report* at 127–39, H.R. Permanent Select Comm. on Intelligence, Dec. 2019, https://bit.ly/2w9OxYn. Defendants have asserted that the presidential communications privilege (in conjunction with the deliberative process privilege) prevents a number of the records at issue—records concerning the withholding of assistance to Ukraine—from being disclosed. But applying the presidential communications privilege to shield the communications of the President or his senior advisors concerning the relevant misconduct here—unlike in *In re Sealed Case*—would not protect any legitimate presidential decisionmaking process or serve the interests of ensuring that the president is able to consider frank advice regarding how best to take care that the laws are

faithfully executed or whether to remove officials who may have acted unlawfully. Instead the privilege, in the absence of applying a misconduct exception, would merely operate to shield the President's own wrongdoing from disclosure. And, as above, even if the privilege technically applied, Defendants have failed to make the independent and necessary showing that disclosing the information would cause a foreseeable harm to an interest protected by the exemption, as the presidential communications privilege exists to protect the candor of legitimate presidential deliberations, not to conceal evidence of presidential wrongdoing. *See* 5 U.S.C. § 552(8)(A)(i)(I).

## V.   Atypical Privilege Claims Over Small Numbers of Documents Warrant *In Camera* Review.

*In camera* review is particularly appropriate in FOIA cases where, as here, an agency makes an atypical privilege claim over a small number of records. FOIA mandates that a "district court must 'determine the matter de novo' and '*may* examine the contents of such agency records in camera....'" *Carter v. U.S. Dep't of Commerce*, 830 F.2d 388, 392 (D.C. Cir. 1987) (emphasis in original) (citing 5 U.S.C. § 552(a)(4)(B). The "decision to conduct an *in camera* review is committed to the 'broad discretion of the trial court judge.'" *Quiñon v. FBI*, 86 F.3d 1222, 1227 (D.C. Cir. 1996) (quoting *Lam Lek Chong v. DEA,* 929 F.2d 729, 735 (D.C. Cir. 1991); *see also id.* ("While *in camera* examination need not be automatic, in many situations it will plainly be necessary and appropriate.") (quoting S. Conf. Rep. No. 1200, 93d Cong. 2d Sess. 9 (1974), *reprinted in* 1974 U.S.C.C.A.N. 6267, 6287). The D.C. Circuit has explained that, "[t]he ultimate criterion" for a court to decide whether to conduct *in camera* review is "[w]hether the district judge believes that *in camera* inspection is needed in order to make a responsible de novo determination on the claims of exemption." *Carter*, 830 F.2d at 392 (citing *Ray v. Turner,* 587 F.2d 1187, 1195 (D.C. Cir. 1978)). *In camera* review is "particularly appropriate" when (1) "the agency affidavits are insufficiently detailed to permit meaningful review of exemption claims or

there is evidence of bad faith on the part of the agency," (2) "the number of the withheld documents" is low, and (3) "the dispute turns on the contents of the withheld documents, and not the parties' interpretations of those documents." *Quiñon*, 86 F.3d at 1228 (internal citations omitted).

The posture of this case militates in favor of *in camera* review. First, the number of documents is relatively few. Second, Defendants have raised privileges in several atypical ways, with only vague explanations to justify their assertions, leaving Plaintiff and the Court with asymmetrical information about the underlying information, and making it unlikely the Court can reach a "responsible de novo determination on the claims of exemption" without further information. *Carter*, 830 F.2d at 392. Specifically, Defendants claimed the presidential communications privilege over internal agency records and OMB communications with DoD that did not include a covered White House official.[18] And unredacted portions of the records over which Defendants invoke the deliberative process privilege strongly suggest that the redacted information is post-decisional. Third, there are, at a minimum, significant questions about whether the redacted information relates to misconduct or an unlawful act. Finally, public reports by individuals who have reviewed unredacted versions of the records in question have indicated that the redactions appear to be improper and that information was withheld to conceal embarrassing facts—suggesting reason to be concerned about "bad faith on the part of the

---

[18] Courts in this district have reviewed records *in camera* in deciding whether agencies properly asserted the presidential communications privilege. *See, e.g. Judicial Watch I*, 365 F.3d at 1115 (discussing district court's *in camera* review); *Ctr. for Effective Gov't*, 7 F. Supp. 3d at 19; *Judicial Watch, Inc. v. U.S. Dep't of State*, No. 13-CV-772 (CKK), 2019 WL 4228341, at *2 (D.D.C. Sept. 5, 2019). For "[t]he very reason that presidential communications deserve special protection, namely the President's unique powers and profound responsibilities, is simultaneously the very reason why securing as much public knowledge of presidential actions as is consistent with the needs of governing is of paramount importance." *Ctr. for Effective Gov't*, 7 F. Supp. 3d at 24 (citing *In re Sealed Case,* 121 F.3d at 749).

agency." *See* Kate Brannen, *Exclusive: Unredacted Ukraine Documents Reveal Extent of Pentagon's Legal Concerns*, Just Security, Jan. 2, 2020, https://bit.ly/2UOiLdT; *see also* Kate Brannen (@K8brannen), Twitter, (Jan. 28, 2020, 9:37 AM), https://bit.ly/2waBciu ("Having viewed unredacted copies of the emails, I can report that several redactions merely hide embarrassing details . . .").

Collectively these facts indicate *in camera* review is appropriate here.

## CONCLUSION

The overbroad understanding of the deliberative process and presidential communications privileges advanced by Defendants here would have wide-ranging and deleterious consequences for governmental transparency and accountability. Expanding these narrowly drawn privileges as Defendants propose would threaten to conceal or obscure broad swathes of governmental decisions, actions, and the reasons for them from public scrutiny. FOIA was designed "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny" and these purposes underscore the importance of careful assessment and narrow construction of exemptions to meaningfully realize the statute's strong presumption in favor of disclosure. For these reasons, *amici* respectfully suggest that this Court should grant Plaintiff's cross-motion for summary judgment with regard to the withheld materials discussed herein and deny Defendants' motion for summary judgment.

Dated: February 14, 2020

Respectfully submitted,

*/s/ Austin R. Evers*
Austin R. Evers
D.C. Bar No. 1006999
Christine Monahan
D.C. Bar No. 1035590
Daniel A. McGrath
D.C. Bar No. 1531723
AMERICAN OVERSIGHT
1030 15th Street NW, B255
Washington, DC 20005
(202) 869-5246
austin.evers@americanoversight.org
christine.monahan@americanoversight.org
daniel.mcgrath@americanoversight.org

Sean A. Lev, D.C. Bar No. 449936
Nitin Shah, D.C. Bar No. 156035
DEMOCRACY FORWARD
FOUNDATION
1333 H Street NW, 11th Floor
Washington, DC 20005
(202) 448-9090
slev@democracyforward.org
nshah@democracyforward.org

*Counsel for* Amici Curiae