**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CENTER FOR PUBLIC INTEGRITY | \| |
| | \| |
| Plaintiff, | \| |
| | \| |
| v. | \|          Civil Action No. 19-3265 (CKK) |
| | \| |
| U.S. DEPARTMENT OF DEFENSE | \| |
| | \| |
| and | \| |
| | \| |
| OFFICE OF MANAGEMENT AND BUDGET | \| |
| | \| |
| Defendants. | \| |

**PLAINTIFF'S REPLY IN SUPPORT OF ITS**
**CROSS-MOTION FOR SUMMARY JUDGMENT**

## <u>TABLE OF AUTHORITIES</u>

## Cases

*Alexander v. FBI*, 186 F.R.D. 154 (D.D.C.1999) .................................................................................15
*Bartko v. U.S. DOJ*, 2018 WL 4608239 (D.D.C. Sept. 25, 2018) ........................................................11
*Campbell v. U.S. Dep't of Justice*, 164 F.3d 20 (D.C. Cir. 1998)..........................................................4
*Cause of Action Inst. v. United States Dep't of Justice*, 330 F. Supp. 3d 336 (D.D.C. 2018) ...................7
*Coastal States Gas Corp. v. U.S. Dep't of Energy*, 617 F.2d 854 (D.C. Cir. 1980).............................6, 7
*Ctr. For Effective Gov't v. U.S. Dep't of State*, 7 F. Supp. 3d 16 (D.D.C. 2013) .................................10
*Dean v. FDIC*, 389 F. Supp. 2d 780 (E.D. Ky. 2005).........................................................................23
*FTC v. Boehringer Ingelheim Pharm., Inc.*, 892 F. 3d 1264 (D.C. Cir. 2018) .......................................6
*Hall v. CIA*, 881 F. Supp. 2d 38 (D.D.C., 2012)..............................................................................23
*Hunton & Williams LLP v. U.S. Envtl. Prot. Agency*, 248 F. Supp. 3d 220 (D.D.C. 2017) ....................4
*In re Kellogg Brown & Root, Inc.*, 756 F.3d 754 (D.C. Cir. 2014)........................................................4
*Judicial Watch, Inc. v. Dep't of Justice*, 365 F.3d 1108 (D.C. Cir. 2004) ..............................................7
*Judicial Watch, Inc. v. U.S. Dep't of Commerce*, 375 F. Supp. 3d 93 (D.D.C. 2019) .......................17, 18
*Judicial Watch, Inc. v. U.S. Dep't of State*, 285 F. Supp. 3d 249 (D.D.C. 2018).................................11
*Loving v. U.S. Dep't of Defense*, 550 F.3d 32 (D.C. Cir. 2008) ...........................................................8
*Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242 (D.C. Cir. 1977) ..........................6, 23
*Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157 (2004)......................................................12
*Nat'l Whistleblower Ctr. v. Dep't of Health & Human Servs.*, 903 F. Supp. 2d 59 (D.D.C. 2012).........11
*Neighborhood Assistance Corp. of Am. V. U.S. Dep't of Hous. & Urban Dev.*, 19 F. Supp. 3d 1 (D.D.C. 2013) ....11
*New York Times Co. v. United States*, 403 U.S. 713 (1971) ...............................................................13
*NLRB v. Robbins Tire Co.*, 437 U.S. 214 (1978).............................................................................12
*Reinhard v. Dep't of Homeland Sec.*, 2019 WL 3037827 (D.D.C. July 11, 2019) .................................11
*Rosenberg v. U.S. Dep't of Defense*, 342 F. Supp. 3d 62 (D.D.C. 2018)...............................................18
*Tax Analysts v. I.R.S.*, 117 F.3d 607 (D.C. Cir. 1997)......................................................................6
*The Protect Democracy Project, Inc. v. U.S. Dep't of Def.*, 320 F. Supp. 3d 162 (D.D.C. 2018)..........4, 5
*U.S. Dep't of Justice v. Reporters Comm. For Freedom of Press*, 489 U.S. 749, 109 S. Ct. 1468, 103 L. Ed 2d 774 (1989)................................................................................................................................12
*Vento v. IRS*, 714 F. Supp. 2d 137 (D.D.C. 2010) ............................................................................6

## Statutes

10 U.S.C. § 130c..........................................................................................................................20
FOIA Improvement Act of 2016......................................................................................................17

## Other Authorities

Deposition of Laura Cooper (Oct. 23, 2019), https://docs.house.gov/meetings/IG/IG00/CPRT-116-IG00-D012.pdf2
Deposition of Mark Sandy (Nov. 16, 2019), https://intelligence.house.gov/uploadedfiles/sandy_final_redacted.pdf
..............................................................................................................................................16, 19
Eric Lipton, Maggie Haberman and Mark Mazzetti, "Behind the Ukraine Aid Freeze: 84 Days of Conflict and Confusion," *The New York Times* (Dec. 29, 2019), https://www.nytimes.com/2019/12/29/us/politics/trump-ukraine-military-aid.html.......................................................................................................................9
Kate Brannen, "Exclusive: New Unredacted Emails Show How Deeply OMB Misled Congress on Ukraine," *Just Security* (Feb. 11, 2020), https://www.justsecurity.org/68614/exclusive-new-unredacted-emails-show-how-deeply-omb-misled-congress-on-ukraine/................................................................................14, 22
Kate Brannen, "Exclusive: Unredacted Ukraine Documents Reveal Extent of Pentagon's Legal Concerns," *Just Security* (Jan. 2, 2020), https://www.justsecurity.org/67863/exclusive-unredacted-ukraine-documents-reveal-extent-of-pentagons-legal-concerns/................................................................................9, 14, 22
Mick Mulvaney, Press briefing (Oct. 17 2019), https://www.whitehouse.gov/briefings-statements/press-briefing-acting-chief-staff-mick-mulvaney/..........................................................................................13, 19
Testimony of Fiona Hill (Oct. 14, 2019), https://docs.house.gov/meetings/IG/IG00/CPRT-116-IG00-D010.pdf......2
Testimony of Gordon Sondland (Oct. 17, 2019), https://docs.house.gov/meetings/IG/IG00/CPRT-116-IG00-D006.pdf.....................................................................................................................................2
Testimony of Laura Cooper (Nov. 20, 2019), https://republicans-intelligence.house.gov/uploadedfiles/cooper_and_hale_hearing_transcript.pdf..................................................16

U.S. Government Accountability Office, Office of Management and Budget — Withholding of Ukraine Security
Assistance, B-331564 (Jan. 16, 2020)..........................................................................................................7, 13, 14

**INTRODUCTION**

Because Defendants have now conducted an additional search and produced one additional document, Plaintiff withdraws its objections to the adequacy of Defendants' search. However, Plaintiff maintains its objections to various sweeping redactions in the documents produced, for which Defendants have not provided persuasive legal justification. Defendants have employed a litany of exemptions in the FOIA statute to deprive the public from learning the details of why the president ordered a halt to the disbursement of congressionally-authorized aid to Ukraine and how OMB and DoD carried out that directive. The various exemptions cited by Defendants are often inapplicable on their face or have been applied in an overbroad manner contrary to law, and Defendants have failed to demonstrate any "foreseeable harm" arising from the release of the documents, particularly given the public's right to understand the full nature of the government misconduct in this case.

**ARGUMENT**

I.      **EXEMPTION 5**

   A.  **Deliberative Process Privilege**

Despite Defendants' arguments (*see* Opp. at 12-13), there was not in any meaningful sense a series of agency decisions from June or July through September 2019 regarding military aid to Ukraine. President Trump made the decision, perhaps on June 19, 2019, or else by July 12, 2019, and OMB and DoD implemented that decision. There is no evidence of any serious

reconsideration of the decision until some details of it became public and prompted a

congressional inquiry in September.

The reason for the president's decision is that Ukraine did not promptly provide him

what he wanted. As President Trump's ambassador to the European Union Gordon Sondland

testified, the aid to Ukraine was withheld as leverage, in what amounted to a "quid pro quo," in

which President Zelensky of Ukraine could get a White House meeting with Trump and a

release of the aid only in return for promising the Burisma investigation. Testimony (Oct. 17,

2019), https://docs.house.gov/meetings/IG/IG00/CPRT-116-IG00-D006.pdf. This was,

according to the testimony of Fiona Hill, President Trump's former top White House adviser on

Russia, also the real reason the aid was withheld. Testimony (Oct. 14, 2019),

https://docs.house.gov/meetings/IG/IG00/CPRT-116-IG00-D010.pdf.

OMB said in the apportionment footnotes that the repeated holds were "to allow for an

interagency process to determine the best use of such funds" (see Doc. 1, e.g. at Bates 3).  But

nothing in the emails or other public testimony sustains this claim, making clear it is a sham.

While some officials supported release of the aid, President Trump's policy persisted, and OMB

continued to include the same footnote language in apportionment documents. As Laura

Cooper, a senior Defense official testified to House committees on October 23, there were

"meetings that occurred in the interagency. But I would not use the term 'review' to describe

any of them because they were all just routine business." Deposition, https://docs.house.gov/-

meetings/IG/IG00/CPRT-116-IG00-D012.pdf, at 92.

Defendants contend that Plaintiff has ignored "the series of agency decisions about

apportionment made throughout the course of the summer that the withheld information

preceded." Opp. at 12. Defendants contend that these documents reflect "OMB's decisions to

extend the pause on the availability of USAI funds for obligation." *Id.* at 12-13. But Defendants

entire argument rests on the false premise that pausing the availability of funds was OMB's

decision to make. OMB cannot credibly assert that it could have defied the president's directive

to pause those funds, nor has it asserted that the withheld documents reflect any sort of

deliberative process about doing so. OMB was merely carrying out the president's order, with

consternation but not deliberation about whether to do so. The various minor decisions

Defendants point to — such as DoD's purported determination "whether and when to send a

particular letter to OMB" — fall within the ambit of executing the president's order and are not

sufficiently meaningful or independent of that order to warrant application of the privilege.

Opp. at 13.

       In that context, Defendants cannot maintain that they were deliberating on whether and

when to resume aid to Ukraine. President Trump had made that decision. The communications

that Defendants are withholding are not part of any deliberative advice to the president, who

was the actual decisionmaker, and could not address the president's considerations of whether

to release or continue to withhold the aid, since his true reasons were closely held. Although

Defendants claim DoD was deciding about what advice and recommendations to provide to

OMB, and more broadly that the footnotes "effectuated the series of decisions that Defendants

discussed," in fact DoD did not send the letter to OMB addressed in some of these emails and it

was not finalized. Policy was, if anything, marked by stasis during this period, in which the only

decision that anyone can point to as relevant to these events is the president's.

**B. Attorney-Client Privilege**

Defendants have not carried their burden of showing that they have properly invoked the attorney-client privilege, which requires them to provide "detailed and specific information" that the withheld information falls within the privilege. *Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 30 (D.C. Cir. 1998).

Defendants do not dispute that the attorney-client privilege may only be invoked if obtaining legal advice was a "primary purpose" of the agency's communication. *See In re Kellogg Brown & Root, Inc.*, 756 F.3d 754, 759-60 (D.C. Cir. 2014). However, Defendants have not established that the withheld communications were sent for the purpose of seeking legal advice at all, let alone for the primary purpose of seeking such advice.

Defendants apparently concede Plaintiff's claim (Memo, at 9) that "there is no overt indication on any of the communications that the [DoD] General Counsel was informed that he was receiving the emails for the purpose of one day securing legal advice, nor that he used them to provide such advice." Defendants argue (Opp., at 8), rather, that their "declarations attest … that the communications sought legal advice [and that] the context reinforces" this conclusion. Defendants do not specify what parts of "the context" support their claim, nor could they given their admission in their opening brief (at 24) that these communications were, to a large extent, simply to keep the DoD General Counsel "in the loop" rather than to solicit legal advice. Indeed, far from establishing "context" to support the proper application of the attorney-client privilege, the *Vaughn* Index for a numerous documents withheld literally says nothing more than there was an email exchange among senior agency officials that happened to "include[] General Counsel and Deputy General Counsel."  See Docs. 20, 21, 33, 34, 38, 40, 75 & 94. *The Protect Democracy Project, Inc. v. U.S. Dep't of Def.*, 320 F. Supp. 3d 162 (D.D.C. 2018) and

*Hunton & Williams LLP v. U.S. Envtl. Prot. Agency*, 248 F. Supp. 3d 220 (D.D.C. 2017) cases cited by Defendants are therefore inapposite because, unlike this matter, the withheld documents in those cases were "the sort of document that would routinely be protected by attorney-client privilege in civil discovery." *Project Democracy Project, Inc.*, 320 F. Supp. 3d at 176.

As to the declarations, Col. Dolberry's Declaration specifies (at ¶¶ 16-17) only two documents, Nos. 20 and 21, that contained, in their redacted sections, "requests for legal advice or assistance." As to the other documents for which attorney-client privilege is claimed, Col. Dolberry asserts that Ms. McCusker "included the DoD General Counsel and other senior attorneys … to seek their input and counsel" (Id., at ¶ 19), but that seems to be no more than surmise, based upon his observation that "[t]hese communications included questions and information relevant to formulating analysis of particular fiscal law issues." Ms. Walsh's Declaration is even more conclusory, noting that policy officials "occasionally sought legal advice" and "discussed and shared … legal advice" and that therefore "OMB withheld information from a total of 30 documents on the basis of the attorney-client privilege." (Walsh Decl., ¶ 29.) Among those 30 documents (see, e.g., Doc. Nos. 38 and 40) are communications that included only DoD officials, so it is particularly unclear whether Ms. Walsh, at OMB, had any facts at hand on which to base her conclusions.

Defendants argue that "the inclusion of other agency officials on these communications does not defeat confidentiality or demonstrate that the purpose was not to obtain legal advice." Opp. At 8. However, Plaintiff is not asserting that the inclusion of other individuals on the emails negates the attorney-client privilege, but rather that Defendants have failed to establish that these communications that included counsel were sent for the primary purpose of obtaining

5

legal advice. Thus, Defendants' reliance on *Coastal States Gas Corp. v. U.S. Dep't of Energy*, 617 F.2d 854 (D.C. Cir. 1980) and *Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242 (D.C. Cir. 1977) is misplaced because neither of those cases held or suggested that the attorney-client privilege is applicable where, as in this instance, counsel is merely "included" in a group email that does not actually seek his or her legal advice. Likewise, *FTC v. Boehringer Ingelheim Pharm., Inc.*, 892 F. 3d 1264 (D.C. Cir. 2018) and *Vento v. IRS*, 714 F. Supp. 2d 137 (D.D.C. 2010) are inapposite because they merely hold that sending factual information to an attorney can be privileged if it is "for the purpose of obtaining legal advice." Opp. at 9. Here, the communications to counsel for the aforementioned documents were merely to keep him "in the loop," as opposed to being sent for the "primary purpose" of seeking legal advice.[1]

Defendants have also not justified their withholdings of statements or descriptions of how their attorneys interpreted applicable law. As Plaintiff noted in its opening brief, at 7, "[t]he privilege … protects communications from attorneys to their clients if the communications rest on confidential information obtained from the client." *Tax Analysts v. I.R.S.*, 117 F.3d 607, 618 (D.C. Cir. 1997). Defendants have not made any claim or argument that disclosing information about their attorneys' legal conclusions, such as the one-line statement in Document 31, at Bates 143 ("OMB OGC determined [redacted, (b)(5)]"), would reveal any confidential information obtained from the client. In Document 31, it does not seem possible that the one redacted line could contain any confidential facts. Plaintiff of course does not know what sort of client information might be associated with Defendants' other invocations of the privilege. However, it must be noted that client information that was confidential or undisclosed at the time of the

---

[1] The fact that Defendants did not assert attorney-client privilege for every document on which counsel was included obviously is insufficient to establish the applicability of the privilege for those in which they did assert the privilege without any indicia that the communications were sent primarily to obtain legal advice. Opp. at 9-10.

communication, but that the government has since publicly acknowledged — for instance, that President Trump and OMB ordered a halt to the obligation of USAI funds — is not protected by the privilege. See *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 863 (D.C. Cir. 1980); *Cause of Action Inst. v. United States Dep't of Justice*, 330 F. Supp. 3d 336, 349 (D.D.C. 2018).

### C. Presidential Communications Privilege

Defendants first assert that they have "withheld a limited amount of information under [the presidential communications] privilege" — namely, 24 out of 111 documents. Opp. at 14. However, withholding all or portions of 22 percent of the responsive records is hardly "limited" in scope, particularly given the admonition from courts in this district that the privilege is to be "construed narrowly." *See Judicial Watch, Inc. v. Dep't of Justice*, 365 F.3d 1108, 1116 (D.C. Cir. 2004).

Defendants further argue that the privilege is applicable because the "[i]nformation withheld under the presidential communications privilege consists of the status of an ongoing decision-making process involving the President." Opp. At 14. But, despite submitting a supplemental declaration from Heather Walsh, Defendants nonetheless fail to identify what "decision-making process" was "ongoing" after the president ordered congressionally approved aid to Ukraine halted on June 19, 2019, before all of the withheld documents were created (or, at the latest, July 12, 2019, as noted in the GAO Report, before all but six of the documents were created). In fact, the only apparent decision the president made following his directive to withhold aid to Ukraine was to lift that order in mid-September after the hold was publicly

revealed. Defendants do not argue — let alone present evidence — that any of the documents at issue were prepared to advise the president on that decision.[2]

Moreover, nothing in Defendants' supplemental materials remedies their woefully inadequate description of documents withheld under the presidential communications privilege. As Plaintiff noted in its opening brief, a party invoking the presidential communications privilege bears the burden of establishing that that documents withheld actually relate to a decision-making process or deliberations by the president. Here, with respect to 17 of the 24 documents (docs. 12, 13, 20, 28, 33, 34, 35, 44, 46, 56, 63, 64, 66, 78, 92, 95 & 107), Defendants merely state that inter-agency materials "reference communications involving the President or his immediate advisors." *See* Defs.' *Vaughn* Index.

Defendants' meager description of these documents fails to establish that the communications were solicited by a White House official, or that the communications were prepared for the purpose of advising the president about any particular decision. In fact, under the description used by Defendants, the documents could be withheld merely because they noted the president's directive to halt aid to Ukraine, i.e., that would constitute a reference to a communication involving the president. With respect to these documents, Defendants appear to be doing precisely what the D.C. Circuit has cautioned against — namely, using the privilege to "shield[] information regarding governmental operations that do not call ultimately for direct decision-making by the president." *In re Sealed Case*, 121 F.3d 729, 752 (D.C. Cir. 1997).

---

[2] Defendants contend that the presidential communications privilege "does not require the information to be pre-decisional to be protected." Opp. at 15 (quoting *Loving v. U.S. Dep't of Defense*, 550 F.3d 32, 37-38 (D.C. Cir. 2008)). However, the court in *Loving* makes clear that, regardless of whether the documents are pre-decisional or post-decisional, they still must "reflect[] 'presidential decisionmaking and deliberations'" for the presidential communications privilege to apply. *Loving*, 550 F.3d at 38 (quoting *In re Sealed Case*, 121 F.3d 729, 744-45 (D.C. Cir. 1997)). For the reasons set forth above, Defendants have failed to satisfy this standard.

Finally, Defendants fail to establish that communications solicited and received by Robert Blair are sufficient to invoke the presidential communications privilege. In her initial declaration, Ms. Walsh merely asserted that Mr. Blair was involved in "national security issues" at the White House without referencing Ukraine. Walsh Decl. at ¶ 32. Ms. Walsh now contends in her supplemental declaration that Mr. Blair's "duties and responsibilities involve national security issues including military assistance to Ukraine[,]" but notably does not contend that he actually provided any advice to the president regarding that issue. In fact, Ms. Walsh is exceedingly vague in her description of Mr. Blair's actual role in advising the president, merely noting that he "regularly briefed the President and participated in meetings with him on subjects within his portfolio[]" and "gathered information to develop and formulate his advice to the President." Walsh Supp. Decl. at ¶ 10. She contends that "the information solicited and received by Mr. Blair was in connection with an ongoing decision-making process involving the President," but neglects to explain the specific nature of that decision-making process or assert that Mr. Blair actually advised the president with respect to that process.

According to excerpts of these documents published in December and January by *The New York Times* and by the website *Just Security*, Mr. Blair's work consisted mostly, if not entirely, of passing information and conveying messages from one official to another, rather than providing advice meant to guide the president's decisionmaking. Eric Lipton, Maggie Haberman and Mark Mazzetti, "Behind the Ukraine Aid Freeze: 84 Days of Conflict and Confusion" (Dec. 29, 2019), https://www.nytimes.com/2019/12/29/us/politics/trump-ukraine-military-aid.html; Kate Brannen, "Exclusive: Unredacted Ukraine Documents Reveal Extent of Pentagon's Legal Concerns" (Jan. 2, 2020), https://www.justsecurity.org/67863/exclusive-unredacted-ukraine-documents-reveal-extent-of-pentagons-legal-concerns/. For example, in an

email in late June, Mr. Blair appears to have merely sought from OMB how much of the aid had been disbursed. This sort of perfunctory communication is not protected from disclosure because there is no indication it was sent by Mr. Blair for the purpose of formulating advice for the president regarding Ukraine. Moreover, it was not Mr. Blair, but other White House aides to the president, including Lt. Col. Alexander Vindman, who were identified during House testimony as the officials responsible for U.S. policymaking regarding military assistance to Ukraine. "At the NSC I am the principal adviser to the National Security Advisor and the President on Ukraine and the other countries in my portfolio. My role at the NSC is to develop, coordinate, and implement plans and policies to manage the full range of diplomatic, informational, military, and economic national security issues for the countries in my portfolio," Vindman told the House Intelligence Committee on November 19th.

Defendants do not dispute that the privilege applies "only if there is an actual advisory relationship between the President and the staffer as to that specific document." *Ctr. For Effective Gov't v. U.S. Dep't of State*, 7 F. Supp. 3d 16, 26-27, 29 (D.D.C. 2013). Defendants' *Vaughn* Index does not even attempt to establish an actual advisory relationship between Mr. Blair and the president with respect to any of the withheld documents, thereby precluding application of the privilege for those documents relevant to him.

## II.     THE GOVERNMENT MISCONDUCT EXCEPTION OVERCOMES EXEMPTION 5 PRIVILEGES

Defendants argue that the Court should not "reverse its previous course and adopt a government misconduct exception to Exemption 5." Opp. At 24. However, there is not a

"previous course" against the application of the government misconduct exception for this Court to reverse.

To the contrary, although the D.C. Circuit has yet to resolve the issue, numerous courts in this district have expressly recognized that "the government-misconduct exception may be invoked to overcome the deliberative-process privilege in a FOIA suit." *Nat'l Whistleblower Ctr. v. Dep't of Health & Human Servs.*, 903 F. Supp. 2d 59, 67 (D.D.C. 2012). See also, e.g., *Reinhard v. Dep't of Homeland Sec.*, 2019 WL 3037827, at *11 (D.D.C. July 11, 2019) (in a FOIA lawsuit, a showing of "extreme government wrongdoing" could overcome the deliberative process privilege); *Bartko v. U.S. DOJ*, 2018 WL 4608239, at *5 (D.D.C. Sept. 25, 2018) (the government misconduct exception applies in FOIA litigation "in cases of extreme government wrongdoing"); *Neighborhood Assistance Corp. of Am. V. U.S. Dep't of Hous. & Urban Dev.*, 19 F. Supp. 3d 1, 14 (D.D.C. 2013) (holding that misconduct "severe enough to qualify as nefarious or extreme government wrongdoing" can overcome the privilege).

In contrast, the cases cited by Defendants do not hold that the government misconduct exemption is inapplicable, but rather merely that the D.C. Circuit has not yet resolved this issue. *See, e.g.*, *Judicial Watch, Inc. v. U.S. Dep't of State*, 285 F. Supp. 3d 249, 253 (D.D.C. 2018) ("It is not clear in this circuit whether a governmental misconduct exception may properly be invoked in a FOIA case"). In fact, Defendants expressly acknowledge that, in dicta, the D.C. Circuit has suggested that the government misconduct exception is applicable in the FOIA context. *See* Opp. at 24; *Neighborhood Assistance Corp. of Am.*, 19 F. Supp. 3d at 13 (noting that the "D.C. Circuit has stated in dicta that 'where there is reason to believe documents sought may shed light on government misconduct, the [deliberative process] privilege is routinely denied, on the grounds that shielding internal government deliberations in this context does not

serve the public's interest in honest, effective government.'") (quoting *In re Sealed Case*, 121

F.3d at 738 (internal quotation marks and citations omitted)). Moreover, the D.C. Circuit in *In*

*re Sealed Case* stated that, while the deliberative process privilege is generally subject to an ad

hoc balancing of various factors, "the privilege disappears altogether when there is any reason

to believe government misconduct occurred." 121 F.3d at 746.

Defendants call for this Court to reject the application of the exception in this case

because "the reasons for a misconduct exception in the grand jury subpoena or civil discovery

context turn on the need to investigate wrongdoing[,]" while a requester's "need for information

is irrelevant" in the FOIA context. Opp. at 24. But Defendants' theory in support of allowing

government misconduct to be hidden from view misses the mark. The issue is not whether the

party requesting the information has a need for it, but rather whether the public is entitled to

know whether, and in what manner, their government officials have engaged in unlawful or

improper conduct.

The Supreme Court has recognized that the basic purpose of FOIA is to realize "the

citizens' right to be informed about what their government is up to[,]" and there can be no more

urgent need for the citizenry to be so informed than in the context of misconduct at the highest

levels of government. *U.S. Dep't of Justice v. Reporters Comm. For Freedom of Press*, 489

U.S. 749, 109 S. Ct. 1468, 103 L. Ed 2d 774 (1989) (internal quotation marks and citations

omitted). *See also Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 172 (2004) (the

Supreme Court holding that public awareness of the government's actions is "a structural

necessity in a real democracy"); *NLRB v. Robbins Tire Co.*, 437 U.S. 214, 242 (1978) ("The

basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of democratic

society, needed to check against corruption and to hold the governors accountable to the

governed."). As Justice William O. Douglas said in his concurring opinion in the "Pentagon

Papers" case (*New York Times Co. v. United States*, 403 U.S. 713, 724 (1971), involving the

government's attempt to hide its internal reports and analyses related to the Vietnam War),

"Secrecy in government is fundamentally anti-democratic, perpetuating bureaucratic errors.

Open debate and discussion of public issues are vital to our national health."

Defendants further assert that, even if the government misconduct exception were

applicable, Plaintiff has not met its burden "to provide an adequate basis for its belief that the

documents at issue in this case might expose government misconduct." Opp. at 25. Defendants

claim that, despite a determination by the GAO that the administration broke the law in

withholding congressionally approved aid to Ukraine, "the official findings of government

bodies independent of the administration do not show that actions discussed in the responsive

emails rise to the level of governmental misconduct." Opp. at 26 (internal quotations omitted).

Defendants base this assertion on three separate grounds, each of which are meritless.

First, Defendants argue that there was no government misconduct by OMB because the agency

purportedly "believed its actions were legal, and disagrees with GAO's view that OMB's

withholding of funds was for a policy reason and not a programmatic delay and thus was 'not

permitted under the Impoundment Control Act." Opp. at 26-27. However, contrary to

Defendants' contention, OMB's own director, Mick Mulvaney, has publicly acknowledged that

there is a "shred of truth" to the determination that "if we didn't pay out the money it would be

illegal … it would be unlawful." Press briefing (Oct. 17 2019), https://www.whitehouse.gov/-
briefings-statements/press-briefing-acting-chief-staff-mick-mulvaney/. In addition, ample

evidence has emerged that agency personnel had serious concerns about the legality of their

actions associated with the Ukraine aid halt. *See, e.g.*, Mark Paoletta, email to Edwin Castle

(Aug. 26, 2019), quoted by Kate Brannen, "Exclusive: New Unredacted Emails Show How Deeply OMB Misled Congress on Ukraine" (Feb. 11, 2020), https://www.justsecurity.org/-68614/exclusive-new-unredacted-emails-show-how-deeply-omb-misled-congress-on-ukraine/, ("OMB appreciates the Department's concerns that funds for the Ukraine Security Assistance Initiative ('USAI') should be made available for obligations as soon as possible in order to facilitate DOD's ability to fully obligate the funds before the funds expire on September 30th."); Draft letter to Russell Vought (Aug. 27, 2019) quoted by Kate Brannen, "Exclusive: Unredacted Ukraine Documents Reveal Extent of Pentagon's Legal Concerns" (Jan. 2, 2020), https://www.justsecurity.org/67863/exclusive-unredacted-ukraine-documents-reveal-extent-of-pentagons-legal-concerns/ ("As a result, we have repeatedly advised OMB officials that pauses beyond Aug. 19, 2019 jeopardize the Department's ability to obligate USAI funding prudently and fully, consistent with the Impoundment Control Act"; redacted version is Doc. No. 49, Bates 28).

Defendants argument that their disagreement with the judgment of an independent body is merely "a type of genuine dispute" and thus does not constitute "misconduct" for the purpose of this judicial review holds no water. The GAO reports to Congress but operates independently of it. The GAO describes itself as "an independent, nonpartisan agency that works for Congress. Often called the 'congressional watchdog,' GAO examines how taxpayer dollars are spent and provides Congress and federal agencies with objective, reliable information to help the government save money and work more efficiently." "About GAO," https://www.gao.gov/about/. Accordingly, the GAO's determination that OMB violated the law is credible and probative, and there can be no "genuine dispute" that it establishes "a discrete factual basis for the belief that the deliberative information sought may shed light on

14

government misconduct" (*Alexander v. FBI*, 186 F.R.D. 154, 164 (D.D.C.1999)), sufficient to overcome the privilege.

Defendants argue that finding the FOIA exemption does not apply in this case means every time an agency advocated a losing legal position in court it would be presumed to have committed misconduct. But the matter at the heart of this FOIA request is whether people inside the government and outside the government judged the actions of the president to be illegal and what they knew and said about this. The purpose of FOIA would be negated if government officials could hide their own wrongdoing simply by asserting that they believed — mistakenly — they weren't violating the law. What matters is that the administration did break the law, and the American people have a right to documents that will shed light on why and how that occurred.

Second, Defendants' assert that OMB's conduct "does not rise to the level of severity necessary to apply the government misconduct exception" because the communications between OMB and DoD regarding the halt on Ukrainian aid are "squarely within one of OMB's core functions." Opp. at 27. However, the issue is not whether OMB's communications with DoD are within its core functions, but rather whether OMB's execution of an unlawful order by the president rises to the level of importance to warrant application of the government misconduct exception. Although it may be true that discussions "with the subject agency" are generally "well within the bounds of OMB's statutory responsibilities" (Opp. at 27-28), they were not so in this instance because they reflect OMB carrying out what the GAO and the House of Representatives determined to be an unlawful decision by the president to withhold congressionally approved aid to Ukraine for improper reasons (which a majority of the House, in particular, deemed nefarious). After all, if unlawful agency conduct leading to the

impeachment of the president — one of only three such votes by the House of Representatives

in the history of the nation — is insufficiently important to invoke the government misconduct

exception, it is hard to imagine what type of conduct would be sufficiently serious to qualify for

the exception.  Finally, Defendants contend that there is no evidence that the communications

between OMB and DoD constitute "evidence of government wrongdoing." However, based on

testimony before the House impeachment inquiry, it is clear that OMB and DoD officials, in

fact, knew that the president's order on Ukraine aid raised significant legal problems. OMB

budget official Mark Sandy — who had received many of the requested messages from the

Defense Department — said he finally issued a temporary hold on the aid the evening of July

25, but at an interagency meeting the following day, he and other officials raised the need to

notify Congress — as the Impoundment Act required — and make the decision public. "We

also raised legal questions," Sandy said. Deposition (Nov. 16, 2019),

https://intelligence.house.gov/uploadedfiles/sandy_final_redacted.pdf, at 55. Defense

Department official Laura Cooper likewise said at an interagency meeting on July 31, that

Congress had to be notified, under the law. But she added, "there was no such notice to my

knowledge, or preparation of such a notice, to my knowledge." Testimony (Nov. 20, 2019),

https://republicans-intelligence.house.gov/uploadedfiles/cooper_and_hale_hearing-
_transcript.pdf, at 58.

      Defendants further contend that the communications are not evidence of wrongdoing

because the misconduct "occurred in the past" and "government officials can still have ordinary

discussions about legitimate policy ends." Opp. at 28 (citations and internal quotations omitted).

But the agencies here cannot separate themselves from the president's decision to withhold aid

to Ukraine because they were the ones that assisted him in carrying out that unlawful policy.

This is not an instance in which the agencies were idly discussing "past misconduct" by the president, but rather involved current and ongoing misconduct by a government agency defying its responsibility to distribute aid authorized by Congress.

## III.    FOIA IMPROVEMENT ACT

Defendants do not dispute that the FOIA Improvement Act of 2016 established a "heightened standard for an agency's withholding under Exemption 5." *Judicial Watch, Inc. v. U.S. Dep't of Commerce*, 375 F. Supp. 3d 93, 100 (D.D.C. 2019). "The purpose of the Act was to establish a 'presumption of openness,' and its passing was based on the recognition that 'from the beginning, agencies have taken advantage of these exemptions to withhold any information that might technically fit.'" *Id.* at 100 (quoting 162 Cong. Rec. H3714-01, H3717162 (2016)).

Defendants are attempting to "take advantage" of Exemption 5 in precisely the manner Congress sought to prevent with the FOIA Improvement Act of 2016. They argue that the documents sought by Plaintiff "technically fit" within the exemption without identifying "'specific, identifiable harm that would be caused by a disclosure' by articulating 'both the nature of the harm and the link between the specified harm and specific information contained in the material withheld.'" *Judicial Watch, Inc.*, 375 F. Supp. 3d at 100 (quoting, H.R. Rep. No. 114-391, at 9 (2016)).

Defendants perfunctorily claim that they have met the foreseeable harm standard because disclosure of the withheld documents purportedly would cause a "chilling [of] future full and frank communications" among agency personnel. Opp. at 18. They contend that the documents were "part of OMB's core function of apportionment" and that that it "is reasonably

foreseeable that if government employees know that such discussions will be publicly disclosed and subjected to media scrutiny, that knowledge will chill their openness in future discussions, thereby hampering OMB's decision-making process …." Opp. at 21.

Defendants' argument fails to satisfy the foreseeable harm standard as it has been interpreted by courts in this district. For example, In *Judicial Watch, Inc. v. Dep't of Commerce*, the Court determined that the government did not meet the standard because "Commerce has provided no explanation as to why disclosure is likely to discourage frank and open dialogue as to the specific withholdings — or categories of withholdings[.]" 375 F. Supp. 3d at 101. As the Court noted, "The question is not whether disclosure could chill speech, but rather if it is reasonably foreseeable that it will chill speech and, if so, what is the link between this harm and the specific information contained in the material withheld. In other words, the Act requires more than speculation, which is all that Commerce has provided through its declarations and Vaughn indexes." *Id. See also Rosenberg v. U.S. Dep't of Defense*, 342 F. Supp. 3d 62, 79 (D.D.C. 2018) (rejecting DoD's foreseeable harm argument because the agency failed to do more than "perfunctorily state that disclosure of all withheld information — regardless of category or substance — would jeopardize the free exchange of information between senior leaders within and outside of the [DoD.]") (internal citation omitted).

As in Rosenberg, Defendants here "perfunctorily state that disclosure of all withheld information — regardless of category or substance — would jeopardize the free exchange of information" among OMB personnel. Id. at 79 (internal citation omitted). They do not identify particularized harm that would be caused by the disclosure of the withheld communications, nor do they establish a link between the specific documents at issue and any alleged harm. The mere fact that the documents relate to OMB's "core function of apportionment" is obviously

insufficient to satisfy the foreseeable harm doctrine, as the issue is not whether apportionment is central to OMB's mission, but rather whether disclosure of the withheld documents would somehow jeopardize that core mission. Defendants have failed to meet that burden. Moreover, Defendants' depiction of the documents as pertaining to OMB's core function is unpersuasive, given that OMB's own officials have testified that the president's decision to secretly halt the spending of congressionally appropriated funds was unique in their experience and that its implementation was outside the scope and boundaries of their past experiences. *See, e.g.*, Deposition of Mark Sandy (Nov. 16, 2019),

https://intelligence.house.gov/uploadedfiles/sandy_final_redacted.pdf, at 87-88.

Indeed, all of the evidence is to the contrary. Defendants do not deny that, in October 2019, OMB Director Mick Mulvaney publicly explained the administration's position as to the potential illegality of withholding congressionally authorized funds to Ukraine — the precise subject matter of the communications at issue here. Opp. at 19. Defendants, of course, cannot possibly establish public harm from disclosure of agency communications on a subject that a top administration official freely discussed before the national press corps and the American public. Although Defendants contend that the agency communications are more detailed than Mr. Mulvaney's presentation, Defendants fail to meet their burden of specifying the nature of those additional details and, importantly, the link between the disclosure of those details and the harm alleged.

Similarly, Defendants do not even argue — let alone establish — that the agencies have been hindered in any way from carrying out their duties via *Just Security*'s publication of the contents of the documents at issue. Although it may be true, as Defendants contend, that they are not required by law to confirm "the accuracy of alleged unauthorized disclosures," they

most certainly are free to argue that the disclosure of those documents have interfered with OMB's operations or otherwise harmed the agency. Defendants' silence on this issue — particularly in the absence of any other indicia that disclosure of the withheld material would cause "foreseeable harm" — speaks volumes.

## IV.    EXEMPTION 1

Defendants have now conceded that most of the information they redacted with the notation "(b)(1)" is not classified. The Second Declaration of Mark H. Herrington, at ¶ 9, states that in Document Nos. 108, 109, and 110, "DoD is only asserting that a very limited amount, meaning a sentence or two in each section annotated with '(b)(1),' is currently and properly classified …."

The greater part of each of those sections is therefore redacted only under the deliberative process privilege and Exemption 5, and the Court need consider only whether that exemption properly applies.

## V.    EXEMPTION 3

The statute at issue, 10 U.S.C. § 130c, protects "sensitive information of foreign governments." Defendants have not rebutted Plaintiff's arguments (Memo, at 22) that the information withheld is not sensitive and in many cases is not secret. Defendants rely entirely on the Ukrainian government's request that this information not be released under the FOIA, but such a request is insufficient where, as in this case, the documents do not appear in any way to be sensitive.

It is in fact, hard to imagine how the information in these documents might impact Ukraine's security, given how closely the country is already watched by all its neighbors and how much information about the scope and character of the aid program was revealed in the largely unredacted documents such as "USAI FY19 Vendor Information" (Doc. Nos. 19, at Bates 121, and 80, at Bates 81).

## VI.    SEGREGABILITY

Defendants plainly have not, as they should have, carefully parsed the information in the documents to segregate all the information that can be released. Defendants assert that Plaintiff has not offered "contrary evidence to rebut the applicable presumption" that Defendants have segregated the information appropriately.  Opp. at 31. But in the new document Defendants have provided — reflecting the message on August 29th from OMB counsel, Mark Paoletta, to Pentagon counsel, Edwin Castle, that was copied to Elaine McCusker at the Pentagon — they provide plentiful evidence themselves that they have made no serious attempt to parse the documents.

"Hi Scott," it says and then contains a page-long, completely blacked out passage before ending with "Please let me know if you have any questions." The censored text of this note was published on February 11 by the website *Just Security*, and it plainly contains information of a factual, nonlegal character that is subject to disclosure under FOIA.[3]

---

[3] The text, as quoted by *Just Security*: "OMB has a responsibility to carry out section 1512 of title 31, U.S. Code, which directs that appropriations should be apportioned by time, purpose, or a combination of both. As such, it is OMB's responsibility to ensure that any apportionment of appropriations is consistent with the administration's policy priorities, to the extent such priorities are supported by the law. To ensure that OMB's apportionment action is consistent with the President's policy priorities, OMB has included a footnote on an apportionment directing that the Department may not obligate funds available for the USAI until an interagency process has been resolved to determine the best use of those funds. OMB's original footnote for the USAI funds and e-mails to DOD staff explaining the footnote made clear that even while operating under the footnote, DOD could proceed with ALL steps necessary short of actually obligating these funds, including being authorized to run any competitive bidding

There are other similar examples. On August 26, Mr. Duffey told Ms. McCusker in an email that the funding hold was being extended again. Ms. McCusker responded, "What is the status of the impoundment paperwork?" To which Mr. Duffey, replied, "I am not tracking that. Is that something you are expecting from OMB?" Ms. McCusker replied: "Yes, it is now necessary — legal teams were discussing last week." Kate Brannen, "Exclusive: Unredacted Ukraine Documents Reveal Extent of Pentagon's Legal Concerns" (Jan. 2, 2020), https://www.justsecurity.org/67863/exclusive-unredacted-ukraine-documents-reveal-extent-of-pentagons-legal-concerns/. Defendants censored all of Ms. McCusker's side of this exchange, including her question and her politically embarrassing factual statement that the funding halt was being discussed by legal experts. *See* Doc. No. 73, Bates 68. On August 27, Ms. McCusker sent a draft note to Mr. Duffey stating factually that "we have repeatedly advised OMB officials that pauses beyond Aug. 19, 2019 jeopardize the Department's ability to obligate USAI funding prudently and fully, consistent with the Impoundment Control Act." Kate Brannen, *op. cit.* (Jan. 2, 2020), This passage, and the remainder of the email recounting what was happening, were entirely censored by Defendants without valid justification. *See* Doc. No. 49, Bates 28.

---

process for the obligation of these funds. In addition, your chart set forth that although a great majority of the funds would be committed by mid-August, the Department would not obligate such funds until mid to late September. As noted in a previous e-mail to the Department, commitments are not legally binding obligations under the recording statute, and therefore, the Department's commitment of these funds would not be impacted by the OMB footnote. Therefore, to the extent that the information captured in your chart is still accurate and that the Department would still plan to obligate the USAI funds by mid to late September, we still see no reason why the footnote would impair the Department's ability to obligate the funds before they expire. It is our understanding that the interagency process to determine the best use of the USAI funds will be resolved in the coming week, and that following the resolution of such process, the Department will have sufficient time to obligate these funds before the funds expire on September 30th." Kate Brannen, "Exclusive: New Unredacted Emails Show How Deeply OMB Misled Congress on Ukraine" (Feb. 11, 2020), https://www.justsecurity.org/68614/exclusive-new-unredacted-emails-show-how-deeply-omb-misled-congress-on-ukraine/.

## VII.   *IN CAMERA* REVIEW

Defendants urge the Court not to conduct an *in camera* review of the redacted documents on the grounds that such a review is not "necessary or appropriate." Opp. at 30. However, Defendants ignore legal precedent establishing that this case is precisely the type of matter for which *in camera* review is warranted.

Specifically, Defendants do not dispute that *in camera* review is appropriate where the records involved are "relatively small" (See *Hall v. CIA*, 881 F. Supp. 2d 38, 74 (D.D.C., 2012)), and where there "is strong public interest in conducting an in camera inspection." *Dean v. FDIC*, 389 F. Supp. 2d 780, 789 (E.D. Ky. 2005). This case falls squarely within both of these criteria.

Defendants have produced only 292 pages of responsive documents, which makes it feasible for the Court to review Defendants' redactions. Moreover, it is hard to fathom a circumstance in which the public would have a stronger interest in ensuring that Defendants' redactions are appropriate. Given the administration's refusal to produce documents in response to subpoenas from the House of Representatives, Plaintiff's FOIA request may be the only means by which the public will be able to determine why congressionally-approved aid to Ukraine was halted, how it was carried out, and who was involved.

In addition, *in camera* review is necessary in this case given the sweeping and facially deficient grounds for withholding documents cited by Defendants in their *Vaughn* Index. *See Mead Data Cent., Inc. v. U.S. Dep't of the Air Force*, 566 F.2d 242, 262 (D.C. Cir. 1977) (holding that a court may order in camera review when "the agency response is vague, its claims too sweeping, or there is a reason to suspect bad faith."). Plaintiff has cited numerous instances in which Defendants have redacted information based on descriptions in their *Vaughn* Index

that fail provide adequate support for their position, e.g., redacting documents on the basis of: (i) attorney-client privilege in which an attorney is merely copied without any indicia legal advice was sought; (ii), presidential communications privilege solely because the president or his advisors were "referenced" in a document, etc. At the very least, Defendants have provided inadequate descriptions in their *Vaughn* index to warrant many of their redactions, thereby necessitating *in camera* review to ensure that all materials that should be produced have been produced.

Contrary to Defendants' assertion, Plaintiff is not seeking *in camera* review on the grounds that "it can't hurt." Opp. at 30. Rather, it seeks *in camera* review to ensure that the American public is not wrongfully denied access to documents that will shed light on the circumstances that ultimately led to the president's impeachment.

## **CONCLUSION**

For the foregoing reasons, Public Integrity asks the Court to deny Defendants' Motion

for Summary Judgment, to grant Plaintiff's Cross-Motion for Summary Judgment, and to order

Defendants to produce the information they have wrongfully withheld.

Respectfully submitted,

_____/S/_____

Peter Newbatt Smith
D.C. Bar #458244
Center for Public Integrity
910 17th Street, N.W., 7th Floor
Washington, DC 20006-2606
202-481-1239
psmith@publicintegrity.org

Attorney for Plaintiff

25